UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THOMAS RYAN, SUSAN RYAN, SEAN GALLAGHER, ASHLEY SULTAN GALLAGHER, MICHELE BURT, NANCY DONOVAN, and LAUREN LADUE, individually and on behalf of others similarly situated, | Civil Action No. 4:25-cv-40026 |
| | CLASS ACTION COMPLAINT |
| *Plaintiffs*, | JURY TRIAL DEMANDED |
| v. | |
| EIDP, INC., DUPONT DE NEMOURS, INC., THE CHEMOURS COMPANY, THE CHEMOURS COMPANY FC, LLC, CORTEVA, INC., BALL CORPORATION, RUST-OLEUM CORPORATION, NEW ENGLAND WASTE SYSTEMS OF ME D/B/A CASELLA ORGANICS, SYNAGRO TECHNOLOGIES, INC., NEW ENGLAND FERTILIZER COMPANY, NEFCO GP I, and NEFCO GP II. | |
| *Defendants*. | |

Plaintiffs Thomas Ryan, Susan Ryan, Sean Gallagher, Ashley Sultan Gallagher, Michele Burt, Nancy Donovan, and Lauren Ladue (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, allege the following based on personal knowledge, information and belief, and investigation of counsel.

<u>INTRODUCTION</u>

1.      Plaintiffs bring this class action against Defendants EIDP, Inc. f/k/a E. I. du Pont de Nemours and Company, DuPont de Nemours, Inc. f/k/a DowDuPont, Inc., The Chemours Company, The Chemours Company FC, LLC, and Corteva, Inc., Ball Corporation, Rust-Oleum Corporation, New England Waste System of ME, Inc., d/b/a Casella Organics ("Casella Organics"), Synagro Technologies, Inc. ("Synagro"), and New England Fertilizer Company

("NEFCO") (collectively, "Defendants") for the claims set forth below resulting from their intentional, reckless, and/or negligent acts and omissions in connection with the discharge, distribution, and/or disposal of per- and polyfluoroalkyl substances and their constituents (collectively referred to in this Complaint as, "PFAS"), which have caused the contamination of real property and drinking water supplies owned and used by Plaintiffs and other class members (the "Class Members").

<u>PARTIES</u>

2.      Plaintiff Thomas Ryan is a Massachusetts citizen domiciled in Westminster, Massachusetts.

3.      Plaintiff Susan Ryan is a Massachusetts citizen domiciled in Westminster, Massachusetts.

4.      Plaintiff Sean Gallagher is a Massachusetts citizen domiciled in Westminster, Massachusetts.

5.      Plaintiff Ashley Sultan Gallagher is a Massachusetts citizen domiciled in Westminster, Massachusetts.

6.      Plaintiff Michele Burt is a Massachusetts citizen domiciled in Westminster, Massachusetts.

7.      Plaintiff Nancy Donovan is a Massachusetts citizen domiciled in Westminster, Massachusetts.

8.      Plaintiff Lauren Ladue is a Massachusetts citizen who was domiciled in Westminster, Massachusetts at all times relevant hereto and is currently domiciled Shrewsbury, Massachusetts.

9.      Defendant EIDP, Inc. f/k/a E. I. du Pont de Nemours and Company, is and was at all times relevant hereto a corporation organized under the laws of Delaware with its principle executive office located at 974 Centre Rd. Wilmington, DE 19805.

10.     Defendant DuPont de Nemours, Inc. f/k/a DowDuPont, Inc., is and was at all times relevant hereto a corporation organized under the laws of Delaware with its principle executive office located at 974 Centre Rd. Wilmington, DE 19805. Defendant DuPont de Nemours, Inc. holds liability for the manufacture of PFAS chemicals, including but not limited to PFOA, sold to defendant paper manufacturers and other entities that was used at Defendants' facilities in their manufacturing process as described herein and otherwise manufactured PFAS that contaminated the private property of putative class members.

11.     Defendant The Chemours Company, is and was at all times relevant hereto a corporation organized under the laws of Delaware with its principle executive office located at 1007 market St. Wilmington, DE 19801. Defendant The Chemours Company manufactured PFAS chemicals, including but not limited to PFOA, and sold PFAS to defendant paper manufacturers and other entities that was used at Defendants' facilities in their manufacturing process as described herein and otherwise manufactured PFAS that contaminated the private property of putative class members.

12.     Defendant The Chemours Company FC, LLC, is and was at all times relevant hereto a corporation organized under the laws of Delaware with its principle executive office located at 1007 market St. Wilmington, DE 19801. Defendant The Chemours Company FC, LLC manufactured PFAS chemicals, including but not limited to PFOA, and sold PFAS to defendant paper manufacturers and other entities that was used at Defendants' facilities in their

manufacturing process as described herein and otherwise manufactured PFAS that contaminated the private property of putative class members.

13.     Defendant Corteva, Inc., is and was at all times relevant hereto a corporation organized under the laws of Delaware with its principle executive office located at 974 Centre Rd. Wilmington, DE 19805. Defendant Corteva, Inc. holds liability for the manufacture of PFAS chemicals, including but not limited to PFOA, sold to defendant paper manufacturers and other entities that was used at Defendants' facilities in their manufacturing process as described herein and otherwise manufactured PFAS that contaminated the private property of putative class members.

14.     Defendant Ball Corporation ("Ball") is and was at all times relevant hereto a corporation organized under the laws of Indiana with its principal office located at 9200 W 108th Circle, Westminster, CO 80021.

15.     Defendant Rust-Oleum Corporation ("Rust-Oleum") is and was at all times relevant hereto a corporation organized under the laws of Delaware with its principal office located at 11 E Hawthorn Pkwy, Vernon Hills, IL 60061.

16.     Defendants New England Fertilizer Co. ("NEFCO") is a general partnership with a principal place of business at 500 Victory Road North Quincy, Massachusetts. For the purposes of this Complaint, the term "NEFCO" shall refer collectively to NEFCO, NEFCO GP I, NEFCO GP II, and Synagro.

17.     Defendant NEFCO GP I is a Delaware Limited Liability Company with a principal place of business at 435 Williams Court, Baltimore, Maryland. NEFCO GP I is a general partner of NEFCO.

18.     Defendant NEFCO GP II is a Delaware Limited Liability Company with a principal place of business at 435 Williams Court, Baltimore, Maryland. NEFCO GP II is a general partner of NEFCO.

19.     Defendant Synagro Technologies, Inc. ("Synagro") is a Delaware corporation with its principal place of business located at 1800 Bering Drive, Suite 1000, Houston, Texas.

20.     Defendant New England Waste System of ME, Inc., d/b/a Casella Organics ("Casella Organics") is a corporation with its principal place of business located at 25 Greens Hill Lane, Rutland, Vermont.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed Class exceed $5,000,000.00, exclusive of interest and costs, and the Plaintiffs and most members of the proposed Class are citizens of a state different from at least one defendant.

22.     Venue is proper in this judicial District pursuant to 28 U.S.C. § 1391(b) and (c) because each Defendant transacts business in, is found in, and/or has agents in this District and because some of the actions giving rise to this complaint took place within this District.

23.     The Court has personal jurisdiction over each Defendant. Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the conduct alleged in the Class Action Complaint throughout the United States, including in this District. The conduct was directed at, and has had the effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

FACTUAL BACKGROUND

I.    PFAS: PER- AND POLYFLUORALKYL SUBSTANCES

24.    PFAS chemicals are artificial, long-lasting chemicals.

25.    There are thousands of PFAS chemicals, but Perfluorooctanoic Acid ("PFOA") and Perfluorooctane Sulfonate ("PFOS") are the two most widely used and studied.

26.    PFOA and PFOS began to be applied to industrial and consumer products in the 1940's and 1950's due to their ability to repel water, dirt, oil, and grease, resist heat and protect surfaces.

27.    Applications of PFOA and PFOS have included machinery coatings, clothing, furniture, adhesives, food packaging, paper coatings, heat-resistant non-stick cooking surfaces, and the insulation of electrical wire, and both are used across a wide range of industries, including the paper industry.

28.    PFOS and PFOA have unique properties that make them persistent, bioaccumulative, and toxic.

29.    PFOS and PFOA are colloquially referred to as "forever chemicals" for their ability to persist in the environment indefinitely without breaking down due to the strength of their multiple carbon-fluorine bonds.

30.    PFOS and PFOA are resistant to biodegradation, atmospheric photooxidation, direct photolysis, and hydrolysis.

31.    PFOS and PFOA are water soluble, making them mobile in groundwater and the environment.

32.    Because PFOS and PFOA repel organic materials, they readily leach through soil and can impact and infiltrate groundwater.

33.     Typical water treatment and filtration systems do not filter PFOS and PFOA from contaminated water due to the chemicals' physical and chemical properties.

34.     Likewise, chlorine and other disinfectants that are often added to public drinking water systems are not capable of removing, and do not remove, PFOS or PFOA.

35.     Human consumption and ingestion of PFOS and PFOA result in absorption of PFOS and PFOA in humans' blood, kidney, and liver.

36.     The half-life of PFOS and PFOA within the human body is anywhere from 2 to 9 years.

37.     PFOS and PFOA cross the placental barrier from mother to fetus and pass to infants through breast milk.

38.     The above-described characteristics contribute to health risks associated with human ingestion of PFOS and PFOA, even at low levels.

39.     According to the United States Environmental Protection Agency (the "EPA"), human exposure to PFOS and PFOA is associated with adverse health outcomes, which can manifest years after exposure. Adverse health outcomes linked to PFOS and PFOA include, but are not limited to:

    a.   Reproductive effects such as decreased fertility or increased high blood pressure in pregnant women;
    b.   Developmental effects or delays in children, including low birth weight, accelerated puberty, bone variations, or behavioral changes;
    c.   Increased risk of some cancers, including prostate, breast, kidney, and testicular cancers;
    d.   Reduced ability of the body's immune system to fight infections, including reduced vaccine response;
    e.   Interference with the body's natural hormones;
    f.   Increased cholesterol levels and/or risk of obesity;
    g.   Changes in liver enzymes;
    h.   Increased risk of high blood pressure or pre-eclampsia in pregnant women;
    i.   Small decreases in infant birth weights; and

j.  Suppression of vaccine response (decreased serum antibody concentrations) in children.

40.  Concerns over potential adverse health effects from PFAS chemicals on humans grew in the early 2000s with the discovery of PFOA and PFOS in laboratory studies of human blood. In 2009, the EPA published provisional health advisories for PFOA and PFOS, based on evidence available at that time. The EPA noted that levels of 0.04 ppb in tested sites were "not of concern," and the EPA set the PFOS provisional health advisory at a level of 0.2 ppb and the PFOA provisional health advisory at a level of 0.4 ppb.[1]

41.  In 2016, the EPA issued a revised health advisory, "identify[ing] the concentration of PFOA and PFOS in drinking water at or below which adverse health effects are not anticipated to occur over a lifetime of exposure [as] 0.07 parts per billion (70 parts per trillion) for both PFOA and PFOS."[2]

42.  On June 15, 2022, the EPA released four drinking water health advisories for PFAS, updating and replacing its 2016 PFOA and PFOS advisories based on new science. The updated EPA advisory stated, "some negative health effects may occur with concentrations of PFOA or PFOS in water that are *near zero* and below EPA's ability to detect at this time."[3] The June 15, 2022 EPA advisory reflects the continually advancing and latest understanding that exposure to any amount of PFAS is harmful to humans.

---

[1] https://www.epa.gov/sites/default/files/2015-09/documents/pfoa-pfos-provisional.pdf (accessed Aug. 2, 2022).

[2] https://www.govinfo.gov/content/pkg/FR-2016-05-25/pdf/2016-12361.pdf (accessed Aug. 2, 2022).

[3] *EPA Announces New Drinking Water Health Advisories for PFAS Chemicals, $1 Billion in Bipartisan Infrastructure Law Funding to Strengthen Health Protections*, U.S. ENVIRONMENTAL PROTECTION AGENCY, https://www.epa.gov/newsreleases/epa-announces-new-drinking-water-health-advisories-pfas-chemicals-1-billion-bipartisan (accessed Aug. 2, 2022).

43.     On April 19, 2024, the EPA designated two types of PFAS, perfluorooctanoic acid (PFOA) and perfluorooctanesulfonic acid (PFOS), as hazardous substances under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA).

II.     PFAS REGULATION IN MASSACHUSETTS

44.     The Commonwealth of Massachusetts has strict PFAS standards, including rules for drinking water systems and cleanup of contaminated sites. Massachusetts has invested substantial funding to assist communities that experience PFAS contamination in drinking water.

45.     The Massachusetts Department of Environmental Protection ("MassDEP") has established a drinking water PFAS concentration limit of 20 nanograms per liter (ng/L) (or parts per trillion (ppt)) for the sum of the concentrations of the following six PFAS compounds: (1) PFOS; (2)  PFOA; (3) perfluorohexane sulfonic acid (PFHxS); (4) perfluorononanoic acid (PFNA); (5) perfluoroheptanoic acid (PFHpA); and (6) perfluorodecanoic acid (PFDA)."[4]

46.     According to MassDEP regulations, the release of PFAS to groundwater that is detected in a public water supply well or private drinking water well is considered a "Condition of Substantial Release Migration," which requires notification of affected persons and implementation of "Immediate Response Actions."

47.     PFAS are listed as toxic and hazardous substances under the Massachusetts Toxics Use Reduction Act, *see* G.L. c. 21I and 301 CMR § 41.03(13), and are subject to the notification, assessment and cleanup requirements of the Massachusetts Waste Site Cleanup Program.[5]

---

[4] 310 CMR 22.00.

[5] *Drinking Water Standards and Health Information – Per- and Polyfluoroalkyl Substances (PFAS)*, MASSACHUSETTS DEPARTMENT OF ENVIRONMENTAL PROTECTION, https://www.mass.gov/info-details/per-and-polyfluoroalkyl-substances-pfas#:~:text=On%20October%202%2C%202020%2C%20MassDEP,the%20concentrations%20of%20six%20specific (accessed Aug. 2, 2022).

III.    THE MASSACHUSETTS NATURAL FERTILIZER COMPANY COMPOSTING
        FACILITY

48.     Located at 65 Bean Porridge Hill Road, MassNatural (and at times together with
Seaman Paper) operated "a 30-acre family-owned commercial composting facility on a 240 acre
farm . . . established in 1987."

49.     MassNatural's composting operation became its primary business operating at 65
Bean Porridge Hill Road when a chicken egg farm that had existed at the same location ceased
operations.

50.     As outlined below, the parcel of land on which MassNatural operates is owned by
Otter Farm, an entity that itself is owned by Seaman Paper. The location at 65 Bean Porridge Hill
Road, Westminster, Massachusetts, is referred to in this Complaint as, the "Otter Farm
Property."

51.     MassNatural claimed on its website that it was "fully permitted as a Recycling,
Composting or Conversion (RCC) Operation regulated by the Massachusetts Department of
Environment Protection."[6]

52.     MassNatural's composting operation remains the property's primary business,
and MassNatural composts "a wide variety of organic materials, including short paper fiber,
industrial food processing by-products, restaurant food waste, yard waste, animal/fish
mortalities, and animal manure." MassNatural "utilizes outdoor windrow and static pile
composting and is permitted to accept 91,775 tons of organic materials annually." [7]

---

[6] *Our History*, MASS NATURAL, https://www.mnaturalfertilizer.com/about-us (accessed Aug. 2, 2022).

[7] *Id.*

53.     During the Class Period, MassNatural (and at times, Seaman Paper) operated the composting venture pursuant to two sets of permits: (1) two permits issued in 1987 (the "1987 Permits"); and (2) the 2020 RCC Permit. The first set of permits was issued in 1987 by the Westminster Board of Health and MassDEP and authorized the composting of paper fiber waste and agricultural byproducts. Both the 1987 Permits and the 2020 RCC Permit contained reporting requirements which required, *inter alia*, that MassNatural periodically certify that its operations followed the terms of the permits and applicable regulations.

54.     The 1987 Permits required that MassNatural maintain a groundwater monitoring program which would be able to detect if the composing operation was contaminating the area's groundwater and threatening public health:

> 8. A groundwater monitoring program of the area downgradient to the active composting site shall be conducted by a hydrogeologist or engineer registered in the Commonwealth. The contractors plan for placement, installation, monitoring schedule, and monitoring parameters shall be submitted to the Department by December 1, 1987, for review and approval. No construction of monitoring wells shall begin at the site prior to Department approval.[8]

55.     The 1987 Permits also required, *inter alia*, that a monthly report certifying compliance with the 1987 Permits' conditions, such as the testing of incoming materials, be filed with MassDEP:

> 11. A monthly report, prepared by the Project Manager, shall be submitted to the Department. Such report shall include, but not be limited to, a statement of compliance with the approved plan, records of all data concerning spot analysis of incoming raw material, records of the quantity of all raw materials received, and logs of temperature, oxygen, moisture content, and pH, from the active composting process. The need for continuing submittals or changes in monitoring schedules will be based on Department review.[9]

---

[8] *Westminster Composing Plan Approval issued to Westminster Farms, Inc./Mass Natural Fertilizer Company*, MASS. EXEC. OFFICE OF ENVIRONMENTAL AFFAIRS, DEPT. OF ENVIRONMENTAL QUALITY ENGINEERING, (Oct. 16, 1987).

[9] *Id.*

56.    The 2020 RCC Permit was issued by MassDEP to Massachusetts Natural Fertilizer Company, Inc. as Permittee. The 2020 RCC permit identifies the property owner as George D. Jones on behalf of Otter Farm, Inc. and Seaman Paper Company.

57.    The regulations for RCC permits, including the 2020 RCC Permit that replaced MassNatural's 1987 Site Assignment and MassDEP's composting permit, require the Permittee (in this case, MassNatural) to file an annual compliance certification under pains and penalties of perjury stating whether the operation is in compliance with the conditions outlined in the RCC Permit and applicable regulations or, if not, to state the steps and schedule for returning to compliance.

58.    Specifically, Section(s) VI(B)(2)-(4) of the 2020 RCC Permit requires that;

2. The Permittee shall ensure that the Operation, at all times, is conducted in a manner that prevents an unpermitted discharge of pollutants to air, water, land or other natural resources, does not present a significant threat to public health, safety or the environment, and does not cause or contribute to a condition of public nuisance.

3. The Permittee shall ensure that the Operation, at all times, ensures the quality of the incoming materials, including but not limited to ensuring that the incoming materials are not contaminated by toxic substances at levels which may pose a significant threat to public health, safety or the environment, and that the type and quality of the incoming materials is sufficient for the Operation.

4. The Permittee shall ensure that the Operation, at all times, does not accumulate or store or handle materials of a nature or in quantities so as to cause or pose a threat to the public health, safety, welfare or the environment.

59.    Similarly, Section(s) VII(F)(1)-(2) of the 2020 RCC Permit require:

F. Inspection, Handling and Storage of compostable materials:

1. The Permittee shall ensure that all incoming loads of compostable material at the Operation are inspected by Mass. Natural personnel to determine the presence of unacceptable materials, including but not limited to, hazardous waste and universal waste subject to 310 CMR 30.0000, oil or hazardous materials subject to 310 CMR 40.0000, municipal solid waste, non-compostable recyclable materials, and asbestos-containing materials and asbestos-containing waste materials. **To the greatest extent practicable, Mass Natural personnel shall identify, and prevent processing of, materials that**

**may threaten or cause harm to public health, safety, and the environmental and/or generate nuisance conditions.**

2. The Permittee shall ensure that all incoming loads that contain materials not listed in the table provided in Section VII. A. of this Permit or that contain unacceptable materials, as well as any products contaminated with unacceptable materials, are handled and managed in accordance with all applicable state laws and regulations including without limitation, 310 CMR 16.00, 310 CMR 19.000, 310 CMR 7.00, 310 CMR 30.000, and 310 CMR 40.0000. The Permittee shall ensure that the quality of the incoming materials and the final product is not contaminated by toxic substances at levels which may pose a threat to public health, safety or the environment. (emphasis added).

60.     MassNatural violated the terms of the 2020 RCC Permit by failing to test incoming materials for PFAS, a known hazardous material, and by accepting PFAS-contaminated materials into its composting operations.  Further, MassNatural violated the terms of the 2020 RCC Permit by contaminating the aquifer with PFAS chemicals.

61.     MassNatural failed to test the paper sludge acquired from Seaman Paper for PFAS chemicals (since at least 2020 PFAS was deemed a hazardous material by MassDEP, and knowledge of the health human and environmental hazards of PFAS were or should have been known to each of the Defendants herein long before), and dumped the untested sludge into MassNatural's composting piles where PFAS was allowed to spread and contaminate Westminster residents' water supplies. Additionally, MassNatural sold the untested resultant products (topsoil, etc.) that were tainted with PFAS to unsuspecting consumers such as Plaintiffs and Class Members.

IV.    SEAMAN PAPER COMPANY OF MASSACHUSETTS

62.     Seaman Paper is paper production and distribution company.  Seaman Paper owns the Otter Farm Property by virtue of its ownership of its Otter Farm subsidiary. Seaman Paper has dumped and still dumps waste materials from its manufacturing processes.

63.     Seaman Paper also has owned and operated the Otter River Paper Mill in Otter River, Massachusetts since 1946. Seam Paper operates Otter River Paper 24 hours per day, 7 days a week. Otter River Paper Mill operates two paper machines producing up to 100 tons per day of machine-finished and machine-glazed paper.

64.     As part of its production processes, Otter River Paper treats 900,000 gallons of water per day on-site and has dumped waste materials from its paper manufacturing processes at MassNatural's composting facility on the Otter Farm Property.

65.     Seaman Paper is known for producing specialty lightweight paper products, including food service packaging papers such as basket liners, sandwich wraps, deli papers, and bakery tissue. The food packaging manufactured by Seaman Paper required grease and moisture resistance which was achieved using fluorochemical treatments using PFAS chemicals.

66.     During the Class Period, Seaman Paper was the largest bumper of PFAS-contaminated materials at MassNatural, dumping thousands of tons of short fiber paper sludge at the MassNatural site at the Otter Farm Property.

67.     Seaman Paper has publicly admitted that the food packaging paper it previously manufactured contained PFAS. In a November 20, 2020, post on the Seaman Paper website entitled *EcoLite: PFAS-free grease-resistant paper for food service industry*, Seaman Paper touted the launch of Seaman Paper's EcoLite PFAS-free food packaging paper and stated it would be discontinuing two Seaman Paper lines of food packaging paper that contained PFAS:

> Recognizing the importance of removing PFAS from the supply chain, Seaman Paper has priced EcoLite the same as its existing grease-resistant paper; both stock and custom printing options are available. Our goal is to encourage our customers to transition to this new grade of health-focused, eco-friendly paper with no added cost. We will be discontinuing sales of the two existing grades of grease-resistant paper currently in use by the end of 2021 in attempt to reduce the amount of PFAS in the food service industry.

68.     This same post demonstrates that Seaman Paper was aware of the dangers of PFAS, as the post articulated the known dangers of PFAS:

14

Along with providing high-quality paper-based packaging solutions, Seaman Paper has long been a leader in the food service industry. This standing continues with the release of EcoLite, our new line of PFAS-free grease-resistant paper for basket liners, sandwich wraps and more. This new product allows restaurants, packaging distributors and others in the food service industry to remove harmful chemicals from the food supply chain, creating a safer and more sustainable future.

**The Problem with PFAS**

Per- and polyfluoroalkyl substances—commonly known as PFAS—are a group of chemicals used to make fluoropolymer coatings. These fluorochemicals have been commonly used in paper products such as popcorn bags, shoes, rugs, rain jackets, and firefighting foams. According to the FDA, there are more than 5,000 different types of PFAS. The reason they've been used in paper products in the food industry since the 1940s is that they make the paper resistant to heat, oil, stains, grease, and water, making them more stable, which can help contain and protect food products. However, recent research suggests that these chemicals appear to carry some negative effects.

Many chemicals in this group do not break down properly in the environment. This results in the chemicals passing through soils and wastewater treatment systems, which can contaminate drinking water sources. They then bioaccumulate in humans and animals, where they can stay in the body for long periods of time. Studies have also suggested they're linked to increased cholesterol levels, as well as other negative effects on immune systems such as infant birth weights and even cancer. Other health concerns include fertility problems, liver damage, thyroid disease, and reduced hormone function.

When hot food contacts papers with these chemicals, it triggers a rapid release of the PFAS, which then enter consumers' food, resulting in quick and easy consumption of the chemicals. In fact, upon testing for PFAS levels in the U.S. population, the CDC recently found indications of widespread exposure, emphasizing how easily this group of chemicals enters the body.

69.     Presumably to conceal its wrongdoing, Seaman Paper removed the above-referenced post from its website once the PFAS contamination was discovered at MassNatural.

70.     Despite knowing that its own products contained PFAS and that PFAS was harmful to human health, Seaman Paper did not test *any* of the waste its manufacturing processes generated for PFAS, *ever*.

71.     In 2002 MassNatural was in default on its mortgage and contacted Seaman Paper for help. Seaman Paper diverted its short paper fiber to Mass Natural for composting and bid on the land in a foreclosure auction to ensure that Seaman Paper would still have an outlet for its short paper fiber and to allow MassNatural to continue to function.

72.     Since Seaman Paper acquired the land on which MassNatural operates, Seaman Paper exerted significant influence and control over MassNatural's operations and operated MassNatural as a joint-venture with Seaman Paper, even creating a subpage on Seaman Paper's own website at the URL: www.seamanpaper.com/massnatural which has been removed.

V.    <u>OTTER FARM, INC.</u>

73.    Otter Farm is a Massachusetts corporation and the owner of the Otter Farm Property, where MassNatural operates its composting business. Otter Farm and the Otter Farm Property are wholly owned by Seaman Paper, and Otter Farm's headquarters is at the same address as Seaman Paper.

74.    Otter Farm was incorporated in 2002 by Seaman Paper in connection with Seaman Paper's purchase of the property located at 65 Bean Porridge Hill Road, Westminster, Massachusetts at public auction.

75.    Land records show that Otter Farm acquired the farm at 65 Bean Porridge Hill Road in 2002 from a corporation named Molly Hill Farms, Inc.[10] ("Molly Hill Farms"), which was controlled by William S. Page, Sr., father of the current owner and operator of MassNatural, Williams S. Page, Jr.  Molly Hill Farms, Inc. was organized under the laws of Massachusetts in 1995 and dissolved voluntarily on December 23, 2002. From organization through dissolution, William S. Page Sr. was listed as President, Treasurer, Secretary, and the sole Director of Molly Hill Farms, Inc.

VI.    <u>3M COMPANY</u>

76.    Non-Party 3M Company is and was all times relevant hereto a corporation organized under the laws of Minnesota with its principal executive office located at 3M Center Building 220-11 W-02, Saint Paul, Minnesota.

77.    3M was the dominant global producer of PFOA and related chemicals prior to 2002, when it ceased producing PFOA.

---

[10] According to Molly Hill Farms, Inc.'s Articles of Incorporation, Molly Hill Farms, Inc.'s principal place of business was 65 Bean Porridge Hill Road. William S. Page, Sr. served as President, Treasurer, Clerk, and was the sole Director of Molly Hill Farms, Inc. *See* Articles of Incorporation, Molly Hill Farms, Inc., dated June 6, 1995.

78. The EPA has also identified 3M as "the only US Manufacturer of PFOS." In May of 2000 the EPA announced that 3M would begin to phase out production of PFOS, noting that "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term[.]"[11]

79. 3M's production, knowledge, study, and overall relationship with PFAS, and PFOA and PFOS in particular, are inextricably linked with Defendant DuPont.

80. In 1976 researchers from the University of Rochester, New York published a report that showed widespread contamination of human tissues with organofluorine compounds (organic compounds that contain the carbon-fluorine bond) which likely derived from commercial sources such as PFOA. The authors contacted 3M questioning whether its consumer products containing these compounds could be the source. J.D. LaZerte of 3M advised W. S. Guy, one of the researchers on the project, "not to speculate" on the source of the organofluorine compounds found in human tissues and 3M took no further action to investigate this issue.

81. By 1978, 3M had found elevated organic fluorine levels in the blood of its workers exposed to fluorinated surfactants such as PFOA.

82. In the late 1970's 3M consulted with Dr. Harold C. Hodge of the University of Rochester. At a meeting in 1978, Dr. Hodge told 3M's Medical Director, Dr. F.A. Ubel, that physical examination results of employees should be compared with controls. "There appears to be indications of liver change from the physical examination results. In terms of indicators of liver disorder, there are [sic] a higher percentage of Chemolite [one 3M facility] than at Decatur

---

[11]https://www.epa.gov/archive/epapages/newsroom_archive/newsreleases/33aa946e6cb11f35852568e1005246b4.html (accessed 1/21/2023).

[another 3M facility] and the organically bound fluorine level at Chemolite is correspondingly higher." Dr. Hodge indicated to 3M at this time that a potential hazard was present regarding organofluorine chemical exposure to its workers.

83.    Early PFOA toxicology studies commissioned by 3M were summarized in 1980 and the liver was highlighted as a target organ, while effects on the immune system were also reported. The study reports were not submitted to the EPA until 2000, the year 3M decided to stop manufacturing PFOA.

84.    In 1980 PFOA animal toxicity studies were published by Griffith and Long in the JAIHA.

85.    By 1981 3M was aware that PFOA ingestion caused birth defects in rats.

86.    An experimental study conducted by 3M in 1981 showed birth defects in the eye lens of rats exposed to PFOA. A total of three teratology studies were carried out, all of them finding lens abnormalities in exposed animals.

87.    A cross-sectional study of worker health at 3M's Chemolite plant in Cottage Grove, Minnesota was summarized by a 3M medical officer in 1982 as showing a high prevalence of high blood pressure and elevation of cholesterol. No apparent effort was made to compare the incidence of these conditions to PFOA or PFOS blood levels and the authors concluded that this observation was caused by worker lifestyle, not occupational exposures.

88.    By September of 1984 3M's medical service team noticed an increasing trend in worker organic fluorine concentrations in blood testing that had begun eight years earlier. The team advised "we must view this present trend with serious concern ... exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body."

89.     Thereafter, 3M decided to search to see if it could find any blood samples among its workers that were free of organofluorine compounds. When this was unsuccessful, an internal3M document proposed: "It is in the interest of 3M to strengthen the evidence of nonindustrial sources of organic fluorine in normal human blood." 3M initiated efforts beginning in 1993 to show that organic fluorine in blood could be from entirely natural sources, but was unable to find any data to support this hypothesis.

90.     In the unpublished 1992 thesis of Frank Gilliland, MD who studied the clinical pathology parameters of 111 male workers at 3M's Chemolite plant in Cottage Grove, MN, Dr. Gilliland found a positive correlation between PFOA exposure measured as serum total organic fluorine and estradiol (an adverse effect) and a negative correlation with free testosterone (also an adverse effect) with this association being stronger in older men. Dr. Gilliland concluded that PFOA may affect male reproductive hormones.

91.     Dr. Gilliland's 1992 unpublished thesis from his 3M worker study also showed thyroid effects in 3M production workers that were associated with organofluorine concentrations in worker blood serum. A positive correlation was seen between organic fluorine and the thyroid stimulating hormone in serum, a sign of thyroid deficiency.

92.     By 1993 3M began to monitor PFOA levels in the blood serum of its production workers and conducted a mortality study of such workers showing a 3-fold excess occurrence of prostate cancer in workers employed more than ten years.

93.     When 3M discussed study results on cancer in male rats with colleagues from the UK company ICI in 1995, the latter strongly espoused that APFO should be considered an animal carcinogen, as the benign tumors observed are simply early lesions that ultimately lead to malignant tumors, but 3M representatives disagreed.

94.    In or about 1996 3M commissioned studies to assess the effects of PFOA on humans by exposing monkeys to the chemical. By November of 1998 3M was aware that monkeys in this study were suffering from severe health effects. By 1999 even the monkeys receiving the lowest dose of PFOA were suffering adverse health effects, including liver toxicity, and it was determined that there was no exposure level at which no observable effects could be found (NOEL) in non-human primates.

95.    In late 1998 3M environmental scientist Richard Purdy wrote to his 3M colleague Georjean Adams and suggested that his food chain risk assessment of fluorochemicals produced by 3M once they entered the environment demonstrated a risk that could not be kept confidential. In another email, Purdy stated "For 20 years the division has been stalling in the collection of data needed for evaluating the environmental impact of fluorochemicals. PFOS is the most onerous pollutant since PCB and you want to avoid collecting data that indicates it is probably worse."

96.    In 1999 Dr. Richard Purdy of 3M wrote to his 3M colleagues, Drs. John Buttenhoff and Andrew Seacat that his calculations showed that a "general population member with [PFOA levels of] 70 ppb (in one's blood) could have 36 times more in his liver" due to lifetime accumulation.

97.    In 1999 Purdy drafted a resignation letter that stated: "3M told those of us working on the fluorochemical project not to write down our thoughts or have email discussions on issues because of how our speculations could be viewed in a legal discovery process. This has stymied intellectual development on the issue and stifled discussion of the serious ethical implications of decisions."

98.    In or about 2000 the United States Environmental Protection Agency notified 3M that it intended to pursue more rigorous regulation of the perfluorinated chemicals manufactured by this defendant. Shortly thereafter 3M publicly announced that it was voluntarily withdrawing from the perfluorinated chemical market, including its manufacturing of PFOA. Two of the reasons for 3M's decision were PFOA's bio-persistence and toxicity.

99.    Shortly after 3M decided to terminate its production of PFOA in 2000, groundwater near the 3M Cottage Grove facility in Minnesota was discovered to be highly contaminated with PFOA. Subsequently, perfluorinated compound (PFC) contamination including PFOA and PFOS was found in groundwater further away from the facility, in Washington and Dakota Counties. In Oakdale, MN the average PFOA concentration in the municipal water was 570 ppt. Closer to the Cottage Grove facility groundwater levels were measured as high as 619 ppb (619,000 ppt).

100.    In October of 2001 Paul M. Hinderliter, Ph.D. and Gary W. Jepson, Ph.D. of the DuPont Haskell Laboratory, drafted a paper entitled: "A Simple, Conservative Compartmental Model to Relate Ammonium Perfluorooctanoate (APFO) Exposure to Estimates of Perfluorooctonoate (PFO) Blood Levels in Humans." The paper described calculations which showed that ingestion of 1 part per billion of PFOA in drinking water corresponded to human PFOA blood levels 300 times higher.

101.    In 2003 3M conducted a mortality study of its workers exposed to PFOS, a chemical closely related to PFOA, and reported excess bladder cancer incidence with high exposure jobs.

102.    In 2006, the U.S. EPA reached a settlement agreement with 3M to resolve 3M's alleged reporting violations under the Toxic Substances Control Act regarding its

21

fluorochemicals. The agreement did not require 3M to admit the violations, but the company

agreed to pay a penalty in excess of $1.5 Million Dollars for 244 separate alleged violations.

103.    In 2009 3M performed a follow-up study of its workers exposed to PFOA which

showed an increase in prostate cancer incidence in workers with moderate to high exposures.

104.    The State of Minnesota has determined that over 100 square miles of groundwater

have been contaminated by 3M's disposal of PFCs and the source of residential drinking water

for over 125,000 Minnesotans has been affected by PFC waste disposal.

VII.    THE DUPONT ENTITIES

105.    Defendant EIDP, Inc. f/k/a E. I. du Pont de Nemours and Company ("Old

DuPont"), designed, manufactured, marketed, sold and/or distributed PFAS throughout the

United States starting in at least the 1940s, including PFAS chemicals that were purchased and

utilized by non-parties Seaman Paper, Greif/Newark Group as well as defendants NEFCO, Ball,

and Rust-Oleum. It is these PFAS chemicals, including but not limited to PFOA, that presently

contaminate the soil and drinking water of the Plaintiffs and Class Members.

106.    Old DuPont knew of the hazards of PFAS chemicals to human health and the

environment starting in at least the 1960s.  Old DuPont knew that PFAS could leach into soil and

groundwater after industrial usage and had long lasting impacts on the environment starting in at

least the 1960s.

107.    Old DuPont utilized PFAS including but not limited to PFOA (also referred to as

C-8) in the manufacture of fluoropolymers at its facilities beginning in at least the 1950s.

108.    Defendant DuPont de Nemours, Inc. f/k/a DowDuPont, Inc., received by transfer

from Old DuPont certain of Old DuPont's historic assets and liabilities, including liabilities

relating to the design, manufacture, marketing sale and/or distribution of PFAS.

109.    In 2015 Old DuPont spun off a chemical business which included the design, manufacture, marketing sale and/or distribution of PFAS, along with certain environmental liabilities, to The Chemours Company ("Chemours").  Chemours has continued to design, manufacture, market sell and/or distribute PFAS, including but not limited to PFOA and others purchased and utilized by Defendants which presently contaminate the soil and drinking water of the Plaintiffs and Class Members.

110.    Defendant The Chemours Company FC, LLC, is a subsidiary of Chemours, and manufactures certain PFAS chemicals.

111.    Defendant Corteva, Inc. was spun off from Defendant DuPont de Nemours, Inc., and currently holds certain liabilities of Defendant EIDP, Inc. f/k/a E. I. du Pont de Nemours and Company, including liabilities relating to the design, manufacture, marketing sale and/or distribution of PFAS.  Corteva does business throughout the United States, including in the Commonwealth of Massachusetts.

112.    Collectively, EIDP, Inc. f/k/a E. I. du Pont de Nemours and Company, DuPont de Nemours, Inc. f/k/a DowDuPont, Inc., The Chemours Company, The Chemours Company FC, LLC, and Corteva, Inc. are referred to herein as "The DuPont Entities" or "DuPont."

113.    For decades, 3M was the original and sole manufacturer of the chemical PFOA (perfluorooctanoic acid, or C8) was produced by 3M and sold to and used by DuPont to manufacture Teflon and other products.

114.    In May 2000, under pressure from the EPA and growing evidence of toxicity and global pollution, 3M announced it would voluntarily phase out PFOA. By 2002 3M ceased producing PFOA entirely.

115.     When 3M exited the PFOA business, DuPont – previously a major purchaser and user of 3M's PFOA – built its own PFOA production facility at its Fayetteville Works site in North Carolina. This made DuPont the principal and by 2006 the *only* U.S. manufacturer of PFOA.

116.     By becoming the primary manufacturer of PFOA after 2002, DuPont effectively took over 3M's role in supplying the global market, a fact DuPont itself recognized.

117.     DuPont's most famous use of PFOA was as a processing aid in making Teflon (PTFE) and related fluoropolymers. PFOA lowers the surface tension in the emulsion polymerization process, enabling the creation of non-stick coatings. At Washington Works and other DuPont facilities, PFOA was integral to producing Teflon for cookware, stain-resistant textiles, wiring insulation, and more.

118.     By the 1980s, DuPont knew that PFOA from its Teflon plant was leaching into local drinking water – internal tests in 1984 found PFOA in public water supplies near the plant but, rather than curtail use, DuPont *increased production* in subsequent years.

119.     DuPont's PFOA spread throughout the United States through direct industrial emissions, including wastewater discharge, air pollution, and landfill dumping from manufacturing facilities like DuPont's Washington Works plant and, especially significant here, through consumer products treated with fluorotelomer-based chemicals, such as grease-resistant food packaging and textiles, degraded over time.

120.     Scientific studies establish that DuPont is a primary source of PFOA contamination in the environment, particularly in the post-2002 era, as chemical fingerprinting confirms that the predominantly linear PFOA found in water, soil, and human blood aligns with DuPont's telomer-based production rather than 3M's older electrochemical fluorination process.

24

*See, e.g.,* Kaushik Londhe, Cheng-Shiuan Lee, Carrie A McDonough, Arjun K. Venkatesan*, The Need for Testing Isomer Profiles of Perfluoroalkyl Substances to Evaluate Treatment Processes*, Environ Sci Technol (Oct. 31, 2022), available at

*https://pmc.ncbi.nlm.nih.gov/articles/PMC9670843/*; Jana H. Johansson et al., *Spatial Variation in the Atmospheric Deposition of Perfluoroalkyl Acids: Source Elucidation Through Analysis of Isomer Patterns*, 20 Environ. Sci., Processes & Impacts 997 (2018), available at https://pubs.rsc.org/en/content/articlehtml/2018/em/c8em00102b#:~:text=branched%20and%20li near%20isomers,to%20be%20contributing%20sources%2C%20albeit.

VIII.    <u>BALL CORPORATION</u>

121.    Founded in 1880, Defendant Ball Corporation is a publicly traded, multinational company that "supplies innovative, sustainable aluminum packaging solutions for beverage, personal care and household product customers."[12]

122.    Ball owns multiple facilities through the United States, including a "beverage packaging facility" located at Eleven Adams Road, Saratoga Springs, NY 12866 ("Saratoga Facility").

123.    From 1972 to 2023, Ball also had a facility located at 95 Ballard Rd, Middletown, NY 10941 ("Wallkill Facility"), which has since been closed.

124.    According to MassDEP, and the T&B Report (defined below) published in September 2022, Ball's Saratoga Facility and Wallkill Facility disposed of PFAS-contaminated materials at MassNatural's composting facility on the Otter Farm Property.

---

[12] https://www.ball.com/our-company

125.     Ball began transporting and dumping materials at the Otter Farm Property in 2015.  Since at least 2015, Ball has sent over 5,360 tons of diatomaceous earth filter cake byproduct from its operations to MassNatural for composting.

126.     On July 8, 2022, Tighe & Bond conducted environmental sampling of a stockpile containing approximately 762 cubic yards of Ball Corporation's diatomaceous earth filter cake.

127.     Eight samples (D-1A through D-1H) were collected for PFAS analysis. Two out of the eight samples tested positive for regulated PFAS compounds, with concentrations exceeding the Massachusetts Reportable Concentration for Soil (RCS-1).

128.     For example, the following is a table from the Tighe & Bond report showing dangerous PFAS concentrations found in Ball's waste:

**TABLE 4B**
Summary of Mixed Material Pile Composite Sample Analytical Data
Massachusetts Natural Fertilizer
Westminster, Massachusetts
Last Updated: 8/26/2022 (N. Guidi)

| Parameter | Sample Date | Material | Estimated Volume (CY) | Regulated PFAS Compounds (ug/kg) | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | PFHpA | PFHxS | PFOA | PFNA | PFOS | PFDA |
| | | | MassDEP RCS-1 | 0.5 | 0.3 | 0.72 | 0.32 | 2 | 0.3 |
| Sample ID | | | MassDEP RCS-2 | 400 | 400 | 400 | 400 | 400 | 400 |
| K-2A | | | | 7.49 | 0.465 | 25.5 | 8.74 | 61.6 | 17.6 |
| K-2B | | | | 6.04 | 0.343 J | 23.4 | 7.35 | 45.5 | 15.7 |
| K-2C | | | | 5.43 | 0.447 J | 21.2 | 6.91 | 41.8 | 14.7 |
| K-2D | | | | 5.78 | 0.338 J | 20.6 | 6.36 | 41.5 | 14.6 |
| K-2E | 7/12/22 | Compost | 1,032 | 5.14 | 0.34 J | 18.1 | 5.41 | 34.6 | 12.7 |
| K-2F | | | | 4.98 | 0.281 J | 17.8 | 5.60 | 40.2 | 13.6 |
| K-2G | | | | 5.05 | 0.337 J | 17.3 | 5.52 | 33.9 | 11.7 |
| K-2H | | | | 6.18 | 0.376 J | 23.1 | 7.24 | 44.0 | 15.5 |
| K-2I | | | | 6.60 | 0.411 J | 23.5 | 7.68 | 51.1 | 15.9 |
| K-2J | | | | 7.42 | 0.415 | 26.1 | 8.46 | 52.5 | 17.3 |
| K-3A | | | | 1.94 | <0.526 | 5.81 | 1.31 | 11.7 | 3.43 |
| K-3B | | | | 2.10 | <0.586 | 5.99 | 1.48 | 11.1 | 3.61 |
| K-3C | | | | 1.87 | <0.548 | 5.27 | 1.25 | 10.1 | 3.14 |
| K-3D | | | | 2.32 | <0.512 | 5.67 | 1.31 | 11.4 | 3.06 |
| K-3E | 7/12/22 | Compost | 938 | 2.63 | 0.211 J | 8.05 | 1.54 | 13.6 | 4.58 |
| K-3F | | | | 2.07 | 0.123 J | 5.92 | 1.34 | 12.1 | 3.48 |
| K-3G | | | | 5.97 | 0.316 J | 9.37 | 2.07 | 17.7 | 5.57 |
| K-3H | | | | 4.13 | 0.292 J | 7.88 | 1.44 | 13.7 | 4.00 |
| K-3I | | | | 3.53 | 0.197 J | 7.79 | 2.20 | 15.0 | 5.56 |
| K-3J | | | | 4.01 | 0.209 | 7.15 | 1.89 | 13.8 | 5.49 |
| L-1 | 7/12/22 | Top Shelf | <100 | 1.88 | 0.162 J | 11.3 | 4.11 | 20.9 | 9.11 |
| O-1A | 7/12/22 | Tailings | 136 | 6.18 | 0.318 | 23.8 | 7.55 | 46.3 | 16.3 |
| O-1B | | | | 7.54 | 0.338 | 27.2 | 7.74 | 50.5 | 21.8 |
| O-2A | | | | 4.60 | 0.228 J | 17.0 | 5.61 | 36.1 | 13.3 |
| O-2B | 7/12/22 | Tailings | 148 | 7.37 | 0.411 J | 26.0 | 8.12 | 62.1 | 19.2 |
| O-2C | | | | 4.17 | 0.244 J | 16.5 | 4.80 | 37.6 | 12.0 |
| O-3A | 7/12/22 | Tailings | 133 | 4.55 | 0.185 J | 17.3 | 6.03 | 41.6 | 15.8 |
| O-3B | | | | 5.42 | 0.232 J | 19.5 | 6.55 | 46.1 | 15.1 |
| O-4A | | | | 5.99 | 0.346 | 30.3 | 9.70 | 42.2 | 20.9 |
| O-4B | | | | 4.56 | 0.210 J | 18.6 | 5.74 | 34.8 | 14.1 |
| O-4C | 7/12/22 | Tailings | 386 | 5.16 | 0.310 J | 25.0 | 7.56 | 41.1 | 18.3 |
| O-4D | | | | 6.56 | 0.366 J | 30.0 | 9.47 | 72.3 | 20.6 |
| O-4E | | | | 0.849 | <0.260 | 1.44 | 0.879 | 9.09 | 3.85 |
| O-5A | | | | 3.38 | 0.169 J | 13.4 | 4.70 | 38.9 | 14.8 |
| O-5B | | | | 5.06 | 0.183 J | 18.3 | 6.72 | 45.4 | 21.0 |
| O-5C | 7/12/22 | Tailings | 297 | 1.94 | 0.199 J | 11.7 | 4.82 | 40.4 | 11.2 |
| O-5D | | | | 3.63 | 0.235 J | 16.2 | 6.15 | 48.2 | 14.4 |
| O-5E | | | | 2.34 | 0.222 J | 17.6 | 7.25 | 65.4 | 18.4 |
| Q-1A | | | | 0.462 J | <0.644 | 2.39 | 0.758 | 4.22 | 2.16 |
| Q-1B | 7/11/22 | Red Mud/ Ball Corp. DE | 227 | 0.923 | <0.561 | 5.48 | 1.72 | 10.7 | 4.18 |
| Q-1C | | | | 1.84 | <0.540 | 9.64 | 2.65 | 17.4 | 7.68 |

129.    On July 14, 2023, MassDEP issued a Notice of Responsibility to defendant Rust-Oleum (the "Rust-Oleum Notice of Responsibility") which, among other things, stated:

> MassDEP has identified you as a potentially responsible party for this release based upon your role as a person who by contract, agreement, or otherwise, directly or indirectly, arranged for the transport, disposal, storage or treatment of hazardous material to or in a site from or at which there is or has been a release of hazardous material.
>
> According to available records, you transported or arranged to transport 330.12 tons of food grade shellac process waste to MNF for recycling between January 1 and July 20, 2022. On July 11, 2022, Tighe & Bond, on behalf of MNF, collected samples of materials stockpiled at the Site for PFAS analysis. Tighe & Bond collected four samples, identified as N-1A through N-1D, from a stockpile containing an estimated volume of 340 cubic yards of food grade shellac process waste. One or more regulated PFAS compounds were detected in each of the four samples at concentrations above the RCS-1 soil Reportable Concentrations.

130.    MassDEP's July 14, 2023, NOR therefore cites Ball's role in "directly or indirectly, arrang[ing] for the transport, disposal, storage or treatment of hazardous material to or in a site from or at which there is or has been a release of hazardous material" at the Otter Farm Property, including PFAS.

IX.    RUST-OLEUM CORPORATION

131.    Founded in 1921, Defendant Rust-Oleum Corporation manufactures rust-preventive paints and coatings.[13]

132.    Rust-Oleum has multiple facilities throughout the United States, including a manufacturing facility at 113 Olive St, Attleboro, MA 02703.

133.    In 1994, Rust-Oleum was fully acquired by RPM International Inc., a publicly traded company with a portfolio of market-leading brands like Rust-Oleum.[14]

---

[13] https://www.rustoleum.com/pages/about-rust-oleum/our-history.

[14] https://www.rpminc.com/about-rpm/our-history/.

134.    According to MassDEP, Rust-Oleum disposed of PFAS-contaminated materials at MassNatural's composting facility on the Otter Farm Property.

135.    For instance, records show that Rust-Oleum arranged for the transport and disposal of at least 330.12 tons of food-grade shellac process waste as MassNatural between January 1 and July 20, 2022**.** This waste was incorporated into MNF's composting operations, which subsequently resulted in the widespread release of PFAS into the environment.

136.    Rust-Oleum's relationship with MassNatural was ongoing, beginning many years prior to 2022.  Manifests show Rust-Oleum arranged for the transport and disposal of waste to MassNatural going back to at least 2018, but do not identify 2018 as the first year in which Rust-Oleum transported waste to MassNatural, or otherwise identify the date of first delivery, which likely preceded 2018.

137.    Rust-Oleum received a Beneficial Use Determination (BUD) from the Commonwealth of Massachusetts for disposal of its shellac process waste (also known as red-mud) as far back as at least 2010.

138.    On July 11, 2022**,** Tighe & Bond collected samples from a stockpile containing an estimated 340 cubic yards of the shellac process waste sent to MassNatural by Rust-Oleum. Laboratory testing confirmed the presence of multiple regulated PFAS compounds in all four samples tested, with concentrations exceeding the Massachusetts Reportable Concentration for Soil (RCS-1)**.** These findings indicate that Rust-Oleum's waste contained PFAS, and directly contributed to the contamination of soil and groundwater at the site.

139.    On July 14, 2023, MassDEP issued a Notice of Responsibility to defendant Rust-Oleum (the "Rust-Oleum Notice of Responsibility"), which, among other things, stated:

> MassDEP has identified you as a Potentially Responsible Party for this release based upon your role as a person who by contract, agreement, or otherwise, directly or

<u>indirectly, arranged for the transport, disposal, storage or treatment of hazardous material to or in a site from or at which there is or has been a release of hazardous material.</u>

[Rust-Oleum] transported or arranged to transport 330.12 tons of food grade shellac process waste to [MassNatural] for recycling between January 1 and July 20, 2022. On July 11, 2022, Tighe & Bond, on behalf of [MassNatural], collected samples of materials stockpiled at the Site for PFAS analysis. Tighe & Bond collected four samples, identified as N-1A through N-1D, from a stockpile containing an estimated volume of 340 cubic yards of food grade shellac process waste.  One or more regulated PFAS compounds were detected in each of the four samples at concentrations above the RCS-1 soil Reportable Concentrations.

140.    MassDEP's July 14, 2023, NOR therefore cites Rust-Oleum's role in "directly or indirectly, arrang[ing] for the transport, disposal, storage or treatment of hazardous material to or in a site from or at which there is or has been a release of hazardous material" at the Facility, including PFAS.

X.    <u>NEFCO & SYNARGO</u>

141.    New England Fertilizer Company, or NEFCO, was founded in 1988 to handle elements of the Boston Harbor cleanup.

142.    In 1988, NEFCO was selected by the Massachusetts Water Resources Authority ("MWRA") to manage sewage sludge disposal from the greater Boston area.

143.    NEFCO processes sewage sludge, a mixture of organic and mineral solids, into biosolids.

144.    Biosolids are organic residuals from municipal wastewater treatment and are used in agricultural and fertilizer applications.

145.    NEFCO operates MWRA's residuals processing plant in Quincy, Massachusetts, converting sludge into biosolid pellets.

146.    NEFCO also markets, distributes, and disposes of unmarketable biosolid pellets.

147.    NEFCO engaged Casella Organics to transport and dispose of biosolid pellets at MassNatural.

148.    Since at least 2018, NEFCO has regularly sent biosolid pellets and similar waste products to MassNatural through Casella Organics.

149.    Since 2018, more than 2,800 tons of NEFCO biosolid pellets have been transported to the Otter Farm Property by Casella Organics.

150.    On April 30, 2021, and March 3, 3022, NEFCO tested samples of its biopellets, and the samples were submitted to Alpha Analytical for PFAS analysis by isotope dilution. The laboratory results demonstrated that numerous PFAS compounds were identified in the samples.

151.    In July 2022, Tighe & Bond tested piles at MassNatural containing NEFCO's biopellets, returning the following results showing dangerous PFAS chemicals:

**TABLE 4A**
Summary of Raw Material Pile Composite Sample Analytical Data
Massachusetts Natural Fertilizer
Westminster, Massachusetts
Last Updated: 8/26/2022 (N. Guidi)

| Parameter | Sample Date | Material | Estimated Volume (CY) | Regulated PFAS Compounds (ug/kg) | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | PFHpA | PFHxS | PFOA | PFNA | PFOS | PFDA |
| | | | MassDEP RCS-1 | 0.5 | 0.3 | 0.72 | 0.32 | 2 | 0.3 |
| Sample ID | | | MassDEP RCS-2 | 400 | 400 | 400 | 400 | 400 | 400 |
| A-1A | | | | 0.590 J | 0.180 J | 3.58 | 0.890 | 5.44 | 1.10 |
| A-1B | | | | 0.387 J | <0.746 | 3.70 | 0.725 | 5.39 | 0.958 |
| A-1C | | | | 0.668 J | <0.749 | 3.45 | 1.17 | 6.26 | 1.36 |
| A-1D | 7/11/22 | Bio-Pellets/Greif | 626 | 1.38 | 0.201 J | 8.84 | 3.14 | 20.0 | 8.80 |
| A-1E | | | | 0.413 J | <1.37 | 2.78 | 0.754 | 6.62 | 1.12 |
| A-1F | | | | 0.661 J | <0.779 | 5.97 | 1.37 | 10.1 | 1.54 |
| A-1G | | | | 0.635 J | <0.800 | 4.57 | 0.829 | 6.62 | 1.32 |
| A2-A | | | | 1.71 | 0.353 J | 6.83 | 2.25 | 12.6 | 2.57 |
| A2-B | | | | 0.733 J | 0.435 J | 3.73 | 1.68 | 9.82 | 1.26 J |
| A2-C | | | | 0.447 J | <1.33 | 3.20 | 1.01 J | 5.45 | 0.700 J |
| A2-D | | | | 3.26 | 0.359 J | 10.2 | 1.89 | 17.2 | 5.19 |
| A2-E | 7/13/22 | Bio-Pellets/Greif | 752 | 1.87 | 0.148 J | 8.03 | 1.78 | 15.5 | 4.52 |
| A2-F | | | | 0.926 | <0.598 | 2.80 | 0.734 | 9.64 | 1.20 |
| A2-G | | | | 1.74 | 0.135 J | 5.96 | 1.37 | 14.2 | 3.43 |
| A2-H | | | | 0.940 | <0.854 | 5.13 | 2.74 | 16.6 | 7.50 |
| A2-I | | | | 0.467 J | 0.282 J | 3.63 | 1.22 | 6.71 | 1.05 J |
| A-3A | | | | 0.782 | 0.171 J | 3.90 | 0.952 | 8.40 | 2.12 |
| A-3B | | | | 0.693 J | <1.39 | 4.73 | 0.954 J | 8.80 | 1.86 |
| A-3C | 7/11/22 | Bio-Pellets/Greif | 524 | 0.399 J | 0.217 J | 4.49 | 1.11 | 7.00 | 0.891 |
| A-3D | | | | 0.330 J | <0.632 | 2.62 | 0.483 J | 3.00 | 0.676 |
| A-3E | | | | 0.514 J | 0.209 J | 4.71 | 1.37 | 9.78 | 1.20 |
| A-3F | | | | 0.629 J | <0.747 | 3.88 | 0.929 | 7.19 | 1.53 |

152.    In May 2023, defendant Synagro Technologies, Inc., a company founded in 1986 that serves 1,000 municipal, industrial, and agricultural facilities across North America acquired NEFCO.

XI.    NEW ENGLAND WASTE SERVICES OF ME, INC. D/B/A CASELLA ORGANICS ("CASELLA ORGANICS")

153.    Casella Organics is a Maine corporation that collects and transports organic residuals, such as paper, plastic, metal, glass, organic bio-solids (biopellets), sludge, and specialized hazardous waste to composting facilities.

154.    Casella Organics provides solid waste services to a variety of industries, and specializes in transportation, processing, and recycling of bio-solids, bio-material, bio-sludge, and related specialized waste.

155.    During the Class Period, NEFCO hired Casella Organics to transport its bio pellets to and dispose of them at the MassNatural composting facility on the Otter Farm Property for use by MassNatural in recycling and composting operations.

156.    Accordingly, Casella Organics began transporting and dumping NEFCO materials, including biosolids, at the Otter Farm Property in 2018.

157.    Casella did not test the materials it was transporting or disposing of for NEFCO for PFAS before, during, or after transport.

RELATED PROCEDURAL HISTORY

158.    On August 2, 2022, a subset of Plaintiffs initiated the action now-captioned *Ryan v. Newark Group*, No. 22-cv-40089-MRG (D. Mass) against defendants 3M, MassNatural, Newark Group, Greif, Inc., Caraustar Industries, Otter Farm, Inc., and Seaman Paper ("*Ryan I*").

159.    On September 1, 2023, Magistrate Judge David Hennessy issued a Report and Recommendations on the *Ryan I* defendants' respective motions to dismiss the *Ryan I* Second

Amended Complaint, largely denying the *Ryan I* defendants' motions but dismissing certain entities related to The Newark Group for lack of personal jurisdiction. See *Ryan I*, ECF No. 159.

160.    On December 21, 2023, District Judge Margaret Guzman largely adopted Judge Hennessy's R&R with slight modifications. See *Ryan I*, ECF No. 181.

161.    On May 13, 2024, pursuant to the schedule set forth by the Court in two orders dated March 11, 2024 (*Ryan I*, ECF No. 231) and April 5, 2024 (*Ryan I*, ECF No. 237), Plaintiffs in *Ryan I* moved on consent for leave of court to file a Third Amended Complaint adding DuPont, Ball, and Rust-Oleum as defendants to the *Ryan I* action.

162.    On October 8, 2024, the *Ryan I* Court denied the *Ryan I* plaintiffs' motion to amend as untimely notwithstanding the schedule set by the Court as described above. *Ryan I*, ECF No. 356.

<u>SUBSTANTIVE ALLEGATIONS</u>

163.    Defendants EIDP, Inc. f/k/a E. I. du Pont de Nemours and Company, DuPont de Nemours, Inc. f/k/a DowDuPont, Ball, Rust-Oleum, NEFCO, and Casella Organics, along with non-parties Newark Group, Seaman Paper, Otter Farm, MassNatural, and 3M, are responsible for a widespread environmental disaster in Westminster, Massachusetts. Their collective actions led to the severe contamination of the community's drinking water, soil, and surface water with toxic per- and polyfluoroalkyl substances ("PFAS"), a class of hazardous and persistent chemicals linked to serious health risks.

164.    The extent of this contamination first came to light in January 2022 when a homeowner on Bean Porridge Hill Road, near the MassNatural composting facility at Otter Farm, had their private well tested. The test results revealed a PFAS concentration of 1,335 parts per trillion (ppt), far exceeding the Massachusetts Department of Environmental Protection

("MassDEP") limit of 20 ppt for drinking water. The contamination was confirmed via a subsequent MassDEP test conducted on February 24, 2022 and reported in mid March of 2022, confirmed similarly dangerous levels at 1,021 ppt.

165.    MassDEP initiated broader testing in February 2022, sampling private wells within a 500-foot radius of the initial contamination site. In mid March of 2022 the results of the broader testing were returned, and every single well tested showed PFAS contamination well above levels Massachusetts regulations consider safe, with concentrations ranging from 333 ppt to 1,815 ppt. The affected residences included:

      a.  64 Bean Porridge Hill Road – 1,132 ppt

      b.  66 Bean Porridge Hill Road – 939 ppt

      c.  67 Bean Porridge Hill Road – 1,021 ppt

      d.  68 Bean Porridge Hill Road – 623 ppt

      e.  70 Bean Porridge Hill Road – 333 ppt

      f.  72 Bean Porridge Hill Road – 1,815 ppt

166.    Importantly, the above-referenced PFAS concentrations include chemicals that are various times were exclusively manufactured by either non-party 3M or defendants DuPont within the United States, including perfluorooctanoic acid (PFOA) and perfluorooctanesulfonic acid (PFOS). For example, the water sample from the Ryan residence at 64 Bean Porridge Hill Road revealed PFOA levels at 172 ppt and PFOS at a staggering 848 ppt.

167.    MassNatural's own private well, located on the Otter Farm property, tested at 5,720 ppt—over 286 times the Imminent Hazard Level set by MassDEP. This is the highest PFAS concentration recorded in a private well in Massachusetts, ever.

168.    On March 13, 2022, MassDEP issued a Notice of Responsibility to both MassNatural and Otter Farm, concluding that the PFAS contamination in the study area resulted from groundwater migration from MassNatural's operations at the Otter Farm property. Further Notices of Responsibility were issued to Seaman Paper on May 13, 2022, and to Newark Group's parent company, Greif, on July 20, 2022, confirming that waste products dumped at MassNatural contained PFAS levels exceeding the 20 ppt threshold for imminent hazards.

169.    On May 17, 2022, MassDEP issued a Unilateral Administrative Order ("UAO 1") directing MassNatural to cease distributing materials containing PFAS at levels that would contaminate groundwater used for drinking. On July 20, 2022, MassDEP escalated enforcement by issuing a second Unilateral Administrative Order and Permit Suspension ("UAO 2") against Otter Farm and MassNatural, finding that continued operation of the site posed an active threat to public health and the environment. MassDEP also ordered Otter Farm and MassNatural to immediately halt composting operations at the site.

170.    On September 16, 2022, and as part of MassDEP's investigation, environmental consultants Tighe & Bond published a report (the "T&B Report") documenting the presence of PFAS compounds in compost stockpiles, soil, and groundwater at and around the MassNatural site aiming to assess potential leaching and environmental impact.

171.    As shown below, the T&B Report shows that testing of the composting stockpiles at MassNatural—which contain the materials dumped at MassNatural by Disposal Defendants Ball, Rust-Oleum, NEFCO and Casella Organics, and by non-parties Seaman Paper and Greif/Newark—revealed that these materials contain high, dangerous, concentrations of PFOS, PFOA, and other PFAS chemicals.

172.    Ultimately, at least 400 homes in Westminster have been impacted by the contamination originating from MassNatural. MassDEP together with environmental consultants have tested 276 private wells within a three-square-mile study area. Of those 276 private wells, at least 183 had drinking water with PFAS concentrations above the regulatory threshold of 20 ppt, necessitating installation of Point-of-Entry Treatment ("POET") systems.

173.    The pollution is not confined to groundwater. Surface water testing in Crocker Pond and its tributaries detected PFAS concentrations between 25.5 ppt and 798 ppt, while groundwater monitoring wells in the contamination zone revealed PFAS hundreds of times above safe limits. Further evidence of the ongoing contamination came from MassDEP's passive leachate samplers and precipitation collectors placed in the compost stockpiles at 65 Bean Porridge Hill Road. These tests confirmed substantial PFAS leaching, with direct leachate samples showing PFAS concentrations up in the thousands of parts per trillion, hundreds of times the regulatory limits.

174.    For the residents of Westminster, the consequences of this contamination are severe and ongoing. Those relying on private wells for drinking, cooking, and household use can no longer safely use their water. The installation of filtration systems does not erase the fundamental reality that their properties are contaminated, and the POET systems are unreliable and at their best, require constant monitoring and maintenance.

175.    The contamination has deprived Plaintiffs of the clean water to which they are entitled, diminished their property values, and introduced an ongoing risk of severe health effects associated with long-term PFAS exposure.

176. Moreover, testing has confirmed that PFAS-contaminated groundwater and surface water continue to migrate beyond the initially identified contamination zone, threatening a broader section of the community.

177. Defendants are directly responsible for the plight of the Plaintiffs and the Class Members. Their decision to manufacture, distribute, transport and dispose of PFAS and PFAS-laden waste products at MassNatural, combined with their failure to prevent and remediate the contamination, has resulted in a devastating environmental disaster.

178. The elevated location of the MassNatural site, combined with the permeable sandy glacial till and fractured bedrock, allowed PFAS to infiltrate the groundwater rapidly, forming a distinct contamination plume that continues to expand.

179. Groundwater flow modeling and hydrogeological studies confirm that PFAS contamination originating from the MassNatural facility has migrated to residential wells, surface waters, and beyond. The highest concentrations remain near the site, with predictable decreases along established groundwater flow paths. However, the contamination persists and continues to pose an ongoing threat to Westminster residents, their health, and their property.

180. Plaintiffs and Class Members now face an uncertain future. They have been exposed to toxic chemicals linked to cancer, reproductive harm, immune system suppression, and other serious health conditions. They require medical monitoring and ongoing testing to detect and treat the long-term effects of PFAS exposure. Many cannot sell their homes due to the contamination, and those who wish to relocate face significant financial losses due to the known presence of widespread PFAS pollution in their water and on their land.

181. Defendants, both individually and collectively, must be held accountable for their reckless and negligent actions. Their contamination of Westminster's water supply has caused

irreversible harm, and they must bear the full cost of remediating this environmental disaster and compensating the affected residents for the damage inflicted on their lives, health, and property.

I.    DISPOSAL DEFENDANTS EACH ARRANGED FOR THE TRANSPORT, DISPOSAL, STORAGE OR TREATMENT OF HAZARDOUS MATERIALS CONTAINING PFAS CHEMICALS TO AND AT MASSNATURAL.

182.    Defendants Ball, Rust-Oleum, NEFCO, Casella Organics ("Disposal Defendants"), and non-parties Seaman Paper and Greif/Newark are sophisticated corporate entities that operate in industries well-documented for PFAS contamination, including paper manufacturing and wastewater management. The T&B Report provides clear evidence that each of these entities disposed of materials containing dangerous levels of PFAS, including PFOA, at the MassNatural site in violation of the applicable standards of care as Massachusetts law.

183.    Further, because PFAS accumulates over time, the PFAS in the piles of composting materials lead to higher levels of accumulation in the ground water due to leaching over time.

184.    The paper industry, particularly those producing coated paper products, has been a major contributor to PFAS pollution. Seaman Paper and Greif/Newark, both involved in paper manufacturing and processing, are known to have handled and disposed of materials typically containing PFAS. Moreover, Seaman Paper has admitted to previous manufacturing PFAS-contaminated paper products.

**TABLE 4B**
Summary of Mixed Material Pile Composite Sample Analytical Data
Massachusetts Natural Fertilizer
Westminster, Massachusetts
Last Updated: 8/26/2022 (N. Guidi)

| Parameter | Sample Date | Material | Estimated Volume (CY) | Regulated PFAS Compounds (ug/kg) | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | PFHpA | PFHxS | PFOA | PFNA | PFOS | PFDA |
| | | | **MassDEP RCS-1** | **0.5** | **0.3** | **0.72** | **0.32** | **2** | **0.3** |
| Sample ID | | | **MassDEP RCS-2** | **400** | **400** | **400** | **400** | **400** | **400** |
| E-1A | | | | 0.383 J | <0.658 | **1.50** | 0.408 J | **2.50** | 0.592 J |
| E-1B | | | | 0.447 J | <0.543 | **1.61** | 0.358 J | 1.94 | 0.422 J |
| E-1C | 7/8/22 | Seaman/ Greif | 480 | 0.393 J | <0.617 | **1.76** | 0.525 J | **2.64** | 0.942 |
| E-1D | | | | 0.434 J | <0.601 | **2.24** | 0.630 | **3.49** | 1.28 |
| E-1E | | | | 0.518 J | <0.622 | **2.89** | 0.782 | 4.26 | 1.67 |
| E-2A | | | | **1.24** | <0.616 | **5.68** | 1.28 | 6.91 | 2.90 |
| E-2B | | | | **1.39** | <0.605 | **6.13** | 2.15 | 10.3 | 4.74 |
| E-2C | | | | **2.15** | <0.587 | **8.56** | 3.20 | 14.8 | 6.49 |
| E-2D | 7/8/22 | Seaman/ Greif | 754 | **0.925** | <0.662 | **4.37** | 1.73 | 9.26 | 3.80 |
| E-2E | | | | **2.03** | <0.650 | 10.5 | 4.11 | 20.9 | 8.89 |
| E-2F | | | | **1.44** | <0.532 | **7.43** | 3.33 | 17.5 | 7.12 |
| E-2G | | | | **2.40** | 0.197 J | 11.8 | 4.71 | 24.8 | 8.97 |
| E-2H | | | | **2.02** | <0.691 | 11.1 | 4.40 | 22.0 | 9.06 |
| E-3A | | | | **1.24** | <0.738 | **3.05** | 0.633 J | **3.59** | 1.01 |
| E-3B | | | | **1.13** | <0.721 | **2.55** | 0.493 J | **3.76** | 0.888 |
| E-3C | 7/8/22 | Seaman/ Greif | 428 | **0.711** | <0.652 | **1.91** | 0.387 J | 1.84 | 0.585 J |
| E-3D | | | | 0.571 J | <0.714 | **2.60** | 0.518 J | **4.70** | 1.01 |
| E-3E | | | | 0.658 J | <0.716 | **2.80** | 0.644 | **5.71** | 1.10 |
| E-4 | 7/8/22 | | 52 | **2.11** | 0.180 J | **9.65** | 4.01 | 22.3 | 7.51 |
| E-5A | 7/8/22 | | 143 | **0.652** | <0.484 | **3.63** | 0.627 | **3.68** | 1.09 |
| E-5B | | | | **0.965** | <0.634 | **3.75** | 0.786 | **5.29** | 1.52 |
| E-6A | 7/8/22 | Seaman/ Greif | 137 | 0.707 J | <0.775 | **3.93** | 0.775 | **5.89** | 2.00 |
| E-6B | | | | 0.614 J | <0.627 | **3.70** | 0.965 | **7.95** | 2.62 |
| E-7 | 7/8/22 | | 81 | 0.368 J | <0.707 | **1.55** | 0.375 J | **5.27** | 1.37 |
| E-8 | 7/8/22 | | 70 | 0.383 J | <0.746 | **9.02** | 0.348 | **2.19** | 0.343 J |
| E-9A | | | | 0.603 J | <1.86 | **6.77** | 1.06 J | **6.29** | 1.03 J |
| E-9B | | | | 0.617 J | <1.61 | **3.36** | 0.866 J | **6.58** | 1.19 J |
| E-9C | | | | 0.468 J | <1.84 | **6.91** | 0.829 J | **5.14** | 0.951 J |
| E-9D | 7/12/22 | Seaman/ Greif | 757 | 0.478 J | <1.86 | **4.07** | <1.86 | **3.24** | 0.623 J |
| E-9E | | | | 1.29 J | <1.39 | **2.99** | 0.698 J | 4.23 | 1.39 |
| E-9F | | | | 0.430 J | <1.44 | **2.97** | 0.692 J | 4.18 | 0.796 J |
| E-9G | | | | 0.369 J | <1.23 | **2.24** | 0.475 J | 2.66 | 0.622 J |
| E-9H | | | | **4.40** | <1.06 | **8.65** | 1.47 | 6.71 | 4.02 |

185.    Similarly, the T&B Report shows that defendants Ball Corporation and Rust-Oleum—consistent with the NOR's issued by MassDEP—dumped PFAS-contaminated materials at MassNatural. The T&B Report contains results from a composting pile at the MassNatural site which contained waste from both Ball and Rust-Oleum. The material attributed to Rust-Oleum is identified as "Red Mud."

**TABLE 4B**
Summary of Mixed Material Pile Composite Sample Analytical Data
Massachusetts Natural Fertilizer
Westminster, Massachusetts
Last Updated: 8/26/2022 (N. Guidi)

| Parameter | Sample Date | Material | Estimated Volume (CY) | Regulated PFAS Compounds (ug/kg) | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | PFHpA | PFHxS | PFOA | PFNA | PFOS | PFDA |
| | | | MassDEP RCS-1 | 0.5 | 0.3 | 0.72 | 0.32 | 2 | 0.3 |
| Sample ID | | | MassDEP RCS-2 | 400 | 400 | 400 | 400 | 400 | 400 |
| K-2A | | | | 7.49 | 0.465 | 25.5 | 8.74 | 61.6 | 17.6 |
| K-2B | | | | 6.04 | 0.343 J | 23.4 | 7.35 | 45.5 | 15.7 |
| K-2C | | | | 5.43 | 0.447 J | 21.2 | 6.91 | 41.8 | 14.7 |
| K-2D | | | | 5.78 | 0.338 J | 20.6 | 6.36 | 41.5 | 14.6 |
| K-2E | 7/12/22 | Compost | 1,032 | 5.14 | 0.34 J | 18.1 | 5.41 | 34.6 | 12.7 |
| K-2F | | | | 4.98 | 0.281 J | 17.8 | 5.60 | 40.2 | 13.6 |
| K-2G | | | | 5.05 | 0.337 J | 17.3 | 5.52 | 33.9 | 11.7 |
| K-2H | | | | 6.18 | 0.376 J | 23.1 | 7.24 | 44.0 | 15.5 |
| K-2I | | | | 6.60 | 0.411 J | 23.5 | 7.68 | 51.1 | 15.9 |
| K-2J | | | | 7.42 | 0.415 | 26.1 | 8.46 | 52.5 | 17.3 |
| K-3A | | | | 1.94 | <0.528 | 5.81 | 1.31 | 11.7 | 3.43 |
| K-3B | | | | 2.10 | <0.586 | 5.99 | 1.48 | 11.1 | 3.61 |
| K-3C | | | | 1.87 | <0.548 | 5.27 | 1.25 | 10.1 | 3.14 |
| K-3D | | | | 2.32 | <0.512 | 5.67 | 1.31 | 11.4 | 3.06 |
| K-3E | 7/12/22 | Compost | 938 | 2.63 | 0.211 J | 8.05 | 1.54 | 13.6 | 4.58 |
| K-3F | | | | 2.07 | 0.123 J | 5.92 | 1.34 | 12.1 | 3.48 |
| K-3G | | | | 5.97 | 0.316 J | 9.37 | 2.07 | 17.7 | 5.57 |
| K-3H | | | | 4.13 | 0.292 J | 7.88 | 1.44 | 13.7 | 4.00 |
| K-3I | | | | 3.53 | 0.197 J | 7.79 | 2.20 | 15.0 | 5.56 |
| K-3J | | | | 4.01 | 0.209 | 7.15 | 1.89 | 13.8 | 5.49 |
| L-1 | 7/12/22 | Top Shelf | <100 | 1.88 | 0.162 J | 11.3 | 4.11 | 20.9 | 9.11 |
| O-1A | 7/12/22 | Tailings | 136 | 6.18 | 0.318 | 23.8 | 7.55 | 46.3 | 16.3 |
| O-1B | | | | 7.54 | 0.338 | 27.2 | 7.74 | 50.5 | 21.8 |
| O-2A | | | | 4.60 | 0.228 J | 17.0 | 5.61 | 36.1 | 13.3 |
| O-2B | 7/12/22 | Tailings | 148 | 7.37 | 0.411 J | 26.0 | 8.12 | 62.1 | 19.2 |
| O-2C | | | | 4.17 | 0.244 J | 16.5 | 4.80 | 37.6 | 12.0 |
| O-3A | 7/12/22 | Tailings | 133 | 4.55 | 0.185 J | 17.3 | 6.03 | 41.6 | 15.8 |
| O-3B | | | | 5.42 | 0.232 J | 19.5 | 6.55 | 46.1 | 15.1 |
| O-4A | | | | 5.99 | 0.346 | 30.3 | 9.70 | 42.2 | 20.9 |
| O-4B | | | | 4.56 | 0.210 J | 18.6 | 5.74 | 34.8 | 14.1 |
| O-4C | 7/12/22 | Tailings | 386 | 5.16 | 0.310 J | 25.0 | 7.56 | 41.1 | 18.3 |
| O-4D | | | | 6.56 | 0.366 J | 30.0 | 9.47 | 72.3 | 20.6 |
| O-4E | | | | 0.849 | <0.260 | 1.44 | 0.879 | 9.09 | 3.85 |
| O-5A | | | | 3.38 | 0.169 J | 13.4 | 4.70 | 38.9 | 14.8 |
| O-5B | | | | 5.06 | 0.183 J | 18.3 | 6.72 | 45.4 | 21.0 |
| O-5C | 7/12/22 | Tailings | 297 | 1.94 | 0.199 J | 11.7 | 4.82 | 40.4 | 11.2 |
| O-5D | | | | 3.63 | 0.235 J | 16.2 | 6.15 | 48.2 | 14.4 |
| O-5E | | | | 2.34 | 0.222 J | 17.6 | 7.25 | 65.4 | 18.4 |
| Q-1A | | Red Mud/ | | 0.462 J | <0.644 | 2.39 | 0.758 | 4.22 | 2.16 |
| Q-1B | 7/11/22 | Ball Corp. DE | 227 | 0.923 | <0.561 | 5.48 | 1.72 | 10.7 | 4.18 |
| Q-1C | | | | 1.84 | <0.540 | 9.64 | 2.65 | 17.4 | 7.68 |

186.    NEFCO, operating in sewage sludge and biosolids management, handled materials well known for PFAS accumulation. The T&B Report confirms that biosolids used in the composting operations at MassNatural contained PFAS at levels exceeding regulatory thresholds, reinforcing NEFCO's role in introducing PFOA and other PFAS into the environment.

**TABLE 4A**
Summary of Raw Material Pile Composite Sample Analytical Data
Massachusetts Natural Fertilizer
Westminster, Massachusetts
Last Updated: 8/26/2022 (N. Guidi)

| Parameter / Sample ID | Sample Date | Material | Estimated Volume (CY) | Regulated PFAS Compounds (ug/kg) | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | PFHpA | PFHxS | PFOA | PFNA | PFOS | PFDA |
| MassDEP RCS-1 | | | | 0.5 | 0.3 | 0.72 | 0.32 | 2 | 0.3 |
| MassDEP RCS-2 | | | | 400 | 400 | 400 | 400 | 400 | 400 |
| A-1A | | | | 0.590 J | 0.180 J | 3.58 | 0.890 | 5.44 | 1.10 |
| A-1B | | | | 0.387 J | <0.746 | 3.70 | 0.725 | 5.39 | 0.958 |
| A-1C | | | | 0.668 J | <0.749 | 3.45 | 1.17 | 6.26 | 1.36 |
| A-1D | 7/11/22 | Bio-Pellets/Greif | 626 | 1.38 | 0.201 J | 8.84 | 3.14 | 20.0 | 8.80 |
| A-1E | | | | 0.413 J | <1.37 | 2.78 | 0.754 | 6.62 | 1.12 |
| A-1F | | | | 0.661 J | <0.779 | 5.97 | 1.37 | 10.1 | 1.54 |
| A-1G | | | | 0.635 J | <0.800 | 4.57 | 0.829 | 6.62 | 1.32 |
| A2-A | | | | 1.71 | 0.353 J | 6.83 | 2.25 | 12.6 | 2.57 |
| A2-B | | | | 0.733 J | 0.435 J | 3.73 | 1.68 | 9.82 | 1.26 J |
| A2-C | | | | 0.447 J | <1.33 | 3.20 | 1.01 J | 5.45 | 0.700 J |
| A2-D | | | | 3.26 | 0.359 J | 10.2 | 1.89 | 17.2 | 5.19 |
| A2-E | 7/13/22 | Bio-Pellets/Greif | 752 | 1.87 | 0.148 J | 8.03 | 1.78 | 15.5 | 4.52 |
| A2-F | | | | 0.926 | <0.598 | 2.80 | 0.734 | 9.64 | 1.20 |
| A2-G | | | | 1.74 | 0.135 J | 5.96 | 1.37 | 14.2 | 3.43 |
| A2-H | | | | 0.940 | <0.854 | 5.13 | 2.74 | 16.6 | 7.50 |
| A2-I | | | | 0.467 J | 0.282 J | 3.63 | 1.22 | 6.71 | 1.05 J |
| A-3A | | | | 0.782 | 0.171 J | 3.90 | 0.952 | 8.40 | 2.12 |
| A-3B | | | | 0.693 J | <1.39 | 4.73 | 0.954 J | 8.80 | 1.86 |
| A-3C | 7/11/22 | Bio-Pellets/Greif | 524 | 0.399 J | 0.217 J | 4.49 | 1.11 | 7.00 | 0.891 |
| A-3D | | | | 0.330 J | <0.632 | 2.62 | 0.483 J | 3.00 | 0.676 |
| A-3E | | | | 0.514 J | 0.209 J | 4.71 | 1.37 | 9.78 | 1.20 |
| A-3F | | | | 0.629 J | <0.747 | 3.88 | 0.929 | 7.19 | 1.53 |

187.    Additionally, NEFCO's own testing shows that its biopellets contained dangerous levels of PFAS, including PFOA:

Serial_No:05172115:58

## Lab Duplicate Analysis
### Batch Quality Control

| | | | | | | |
|---|---|---|---|---|---|---|
| **Project Name:** | PFAS COMPOUNDS IN EQ BIOSOLIDS | | | **Lab Number:** | | L2122576 |
| **Project Number:** | Not Specified | | | **Report Date:** | | 05/17/21 |

| Parameter | Native Sample | Duplicate Sample | Units | RPD | Qual | RPD Limits |
|---|---|---|---|---|---|---|
| Perfluorinated Alkyl Acids by Isotope Dilution - Mansfield Lab  Associated sample(s): 02   QC Batch ID: WG1495585-4   QC Sample: L2121832-02  Client ID: DUP Sample | | | | | | |
| Perfluorobutanoic Acid (PFBA) | 12.0 | 12.3 | ng/l | 2 | | 30 |
| Perflouropentanoic Acid (PFPeA) | 30.7 | 31.0 | ng/l | 1 | | 30 |
| Perfluorobutanesulfonic Acid (PFBS) | 4.90 | 4.72 | ng/l | 4 | | 30 |
| 1H,1H,2H,2H-Perfluorohexanesulfonic Acid (4:2FTS) | ND | ND | ng/l | NC | | 30 |
| Perfluorohexanoic Acid (PFHxA) | 31.2 | 31.3 | ng/l | 0 | | 30 |
| Perfluoropentanesulfonic Acid (PFPeS) | ND | ND | ng/l | NC | | 30 |
| Perfluoroheptanoic Acid (PFHpA) | 28.0 | 27.9 | ng/l | 0 | | 30 |
| Perfluorohexanesulfonic Acid (PFHxS) | 3.44 | 3.74 | ng/l | 8 | | 30 |
| Perfluorooctanoic Acid (PFOA) | 126 | 126 | ng/l | 0 | | 30 |
| 1H,1H,2H,2H-Perfluorooctanesulfonic Acid (6:2FTS) | ND | ND | ng/l | NC | | 30 |
| Perfluoroheptanesulfonic Acid (PFHpS) | ND | ND | ng/l | NC | | 30 |
| Perfluorononanoic Acid (PFNA) | 8.52 | 9.08 | ng/l | 6 | | 30 |
| Perfluorooctanesulfonic Acid (PFOS) | 8.66 | 9.55 | ng/l | 10 | | 30 |
| Perfluorodecanoic Acid (PFDA) | ND | ND | ng/l | NC | | 30 |
| 1H,1H,2H,2H-Perfluorodecanesulfonic Acid (8:2FTS) | ND | ND | ng/l | NC | | 30 |
| Perfluorononanesulfonic Acid (PFNS) | ND | ND | ng/l | NC | | 30 |
| N-Methyl Perfluorooctanesulfonamidoacetic Acid (NMeFOSAA) | ND | ND | ng/l | NC | | 30 |
| Perfluoroundecanoic Acid (PFUnA) | ND | ND | ng/l | NC | | 30 |
| Perfluorodecanesulfonic Acid (PFDS) | ND | ND | ng/l | NC | | 30 |
| Perfluorooctanesulfonamide (FOSA) | ND | ND | ng/l | NC | | 30 |

Page 16 of 29

## II.    DUPONT IS ALSO RESPONSIBLE FOR THE PFOA FOUND AT THE MASSNATURAL SITE

188.    Scientific literature and the facts outlined herein establish the substantial certainty that the PFOA found at MassNatural is fluorotelomer-based PFOA, which was developed and manufactured by DuPont in the United States for decades, including on an exclusive basis since 2002.

### a.    DUPONT WAS THE EXCLUSIVE PFOA MANUFACTURER AND SUPPLIER IN THE UNITED STATES FOR MUCH OF THE CLASS PERIOD

189.    As discussed above, throughout the class period, Defendant DuPont maintained exclusive control over the design, manufacture, and distribution of PFOA. Despite overwhelming evidence that PFOA persists in the environment, accumulates in human blood, and poses significant health risks DuPont continued its PFOA production and actively concealed the PFOA's dangers.

190.    Internal company documents, regulatory filings, and whistleblower disclosures confirm that DuPont was fully aware of PFOA's persistence and toxicity for decades, yet it systematically misled regulators, withheld safety data, and prioritized profits over public health. Unlike competitors who ceased production of PFOA, DuPont exploited its monopoly on PFOA, ensuring its continued use in food packaging, nonstick coatings, and industrial applications—furthering widespread contamination and endangering millions of consumers.

i.    Zonyl RP: DuPont's Food Packaging Coating Business

191.    DuPont introduced Zonyl RP in the 1960's as a grease-resistant treatment for paper food packaging. DuPont marketed Zonyl as an innovative solution for fast-food wrappers, pizza boxes, microwave popcorn bags, and countless other consumer products requiring oil and moisture resistance. However, DuPont's internal research soon revealed that Zonyl contained perfluorooctanoic acid (PFOA) precursors, which could migrate into food and accumulate in human blood, posing significant health risks. Despite these findings, DuPont leveraged its monopoly over fluoropolymer and fluorotelomer technology to dominate the food packaging industry, aggressively marketing Zonyl while suppressing unfavorable safety data.

192.    The result was that DuPont's PFOA entered the environment via food packaging products, such as those manufactured by Seaman Paper and recycled by Greif/Newark to manufacture containerboard products in their recycled paper-based manufacturing processes.

193.    After 3M abandoned its own $150 million per year PFAS-coated food packaging business in 2000 after realizing the chemicals were dangerously accumulating in humans, DuPont quickly touted its similar PFOA chemistry (based on its own fluorotelomer technology) to 3M's former customers.

194.    In other words, DuPont seized the market opportunity and became the primary supplier of greaseproof fluorochemical coatings to paper mills and packaging manufacturers— such as Seaman Paper and Newark Group—in the 2000s following 3M's exit from the industry.

195.    Zonyl RP alone generated about $100 million in annual revenue for DuPont by the early 2000s.

196.    Whistleblower evidence later showed that DuPont had long known Zonyl RP was responsible for the spread of PFOA. In 1987, DuPont scientist Dr. Richard Goldbaum found that Zonyl RP coated products were shedding dangerous amounts of PFOA into food and the environment. But, DuPont kept this quiet, did not recall the product or fix the formulation, and continued selling Zonyl RP for another 18 years.

197.    By doing so, DuPont effectively ensured that PFOA and PFOA-generating chemicals remained in wide commercial use on food packaging, including by Seaman Paper and Greif/Newark, through the 1990s and 2000s. As Environmental Working Group (EWG) researchers put it, DuPont kept producing the very chemicals that would end up "contaminating consumers' blood".

198.    In short, DuPont's fluorochemicals for the paper industry became another vector by which DuPont's PFOA (whether as an impurity or breakdown product) spread into the environment and human population.

199.    After DuPont became the primary PFOA producer in 2002, any facility or product using PFOA likely sourced it from DuPont. This means DuPont's PFOA could show up in environments far from DuPont's factories – for instance, at a paper mill or a textile plant that used DuPont's PFAS formulations.

200.    Numerous peer-reviewed studies have found that after 2002, most PFOA found in the environment can be directly attributed to DuPont, as opposed to 3M. For example, analysis of PFOA isomers in the environment shows that after 2002, most PFOA is the linear isomer (consistent with DuPont's telomer-based manufacturing) rather than the mix of branched isomers that 3M's older process produced.

201.    This suggests that recent PFOA in the environment largely came from DuPont/Chemours production rather than 3M's legacy PFOA stock. *See Isomer Profiles of Perfluorochemicals in Matched Maternal, Cord, and House Dust Samples: Manufacturing Sources and Transplacental Transfer,* https://pmc.ncbi.nlm.nih.gov/articles/PMC3226492/.

III.    PFAS SPREAD FROM DISPOSAL DEFENDANTS' MATERIALS DEPOSITED AT 65 BEAN PORRIDGE HILL ROAD TO THE SURROUNDING AREA'S UNDERGROUND WATER SUPPLY.

202.    The dangers of composting hazardous materials are well understood: whatever goes into a composting pile can migrate through soil and into the underground water supply. By failing to use reasonable care to test the materials they were dropping off at MassNatural, Disposal Defendants caused PFAS-contaminated materials to be deposited at MassNatural.

203.    MassNatural is situated at an elevated, topographical high point. The surrounding land is made up of permeable sandy glacial till and fractured bedrock, which—unfortunately for Plaintiffs—allowed PFAS-contaminated leachate emanating from the materials Disposal Defendants dumped to infiltrate the soil and rapidly enter the underlying groundwater system. Once in the subsurface, the PFAS plume migrated radially outward in all directions from the facility, following natural groundwater flow paths and impacting a large surrounding area.

204.    For over three decades, precipitation and surface runoff transported PFAS from the waste piles at MassNatural into the soil and groundwater. The sandy and permeable nature of

the overlying sediments facilitated rapid vertical migration, allowing these contaminants to reach the underlying fractured bedrock aquifer. Once in the groundwater, PFAS moved through interconnected fractures, which serve as conduits for rapid and widespread distribution.

205.    The pumping of private drinking water wells within the contamination plume accelerated the spread of PFAS. Pumping-induced drawdown created localized gradients that pulled contaminated groundwater toward residential wells, increasing exposure levels for affected residents. This effect is well-documented in hydrogeological studies and explains the sustained high concentrations of PFAS in residential drinking water supplies.

206.    In response to these findings, MassDEP conducted an extensive investigation, concluding that the PFAS contamination in the affected area originated from MassNatural's operations. MassDEP issued multiple Notices of Responsibility, confirming that MassNatural, Otter Farm, and other responsible parties were liable for the release of hazardous substances into the environment. Regulatory enforcement actions, including a Unilateral Administrative Order and Permit Suspension, were issued to halt further distribution of PFAS-laden materials and prevent continued environmental harm.

207.    As a result of the above, MassDEP has concluded that **"Based upon the use of materials that contain PFAS at the [65 Bean Porridge Hill Road], and the PFAS detections in the private wells nearby, MassDEP determined that a release of PFAS had come to be located at the Massachusetts Natural Fertilizer Company, Inc. (MNF) property at 65 Bean Porridge Hill Road, Westminster [Otter Farm]."**[15]

---

[15] Greif Notice of Responsibility (emphasis added).

IV.    PLAINTIFFS AND CLASS MEMBERS HAVE BEEN INJURED AS A RESULT
OF DEFENDANTS' CONDUCT

a.    PLAINTIFFS AND CLASS MEMBERS WERE INJURED IN THEIR
PROPERTY.

208.    Defendants' conduct has caused Plaintiffs and Class Members to suffer property

damages via, *inter alia*, (1) a measurable reduction in property values for affected homes; (2)

increased time on the market for homes in the contaminated area, as buyers are reluctant to

purchase properties with known environmental risks; (3) higher rate of withdrawn listings, where

sellers are unable to secure an acceptable price and are forced to pull their properties off the

market; (4) potential barriers to financing, as banks and mortgage lenders hesitate to approve

loans for properties with unresolved environmental contamination; and (5) negative public

perception and stigma, which further reduces market demand for properties in Westminster.

b.    PLAINTIFFS AND CLASS MEMBERS ARE AT AN INCREASED RISK
OF DEVELOPING DANGEROUS DISEASES AND CONDITIONS.

209.    Defendants' conduct caused Plaintiffs and the Class Members to unknowingly

ingest and absorb PFAS via, *inter alia,* their drinking water, the water they used to cook, and the

food which they grew on their properties.

210.    This caused PFAS to bioaccumulate over time in Plaintiffs' and Class Members'

bodies. The presence of manmade foreign substance, PFAS, in their bodies, tissue, and cells

represents a manifest change in the bodies, tissue, and cells of Plaintiffs and Class Members and

leaves Plaintiffs and Class Members at an increased risk of serious disease, illness, or injury.

This is a physiological change in Plaintiffs' bodies occurring at a subcellular level.

211.    Plaintiffs Thomas Ryan, Susan Ryan, and Nancy Donovan, and other Class Members have had their blood tested, and detected the presence of PFAS in their blood above the background level.

212.    For example, on April 26, 2022 Thomas Ryan's blood was tested for PFAS compounds. The results of the testing showed that Mr. Ryan's blood had PFAS concentration levels that were several times the typical background amounts, as illustrated by the following chart:

| Compound | Water Concentration Levels | Typical Blood PFAS Concentration Levels | Thomas Ryan Concentration Levels |
|---|---|---|---|
| PFBS | 1.09 | 0.05 | 0.11 |
| PFDA* | 2.21 | | NT |
| PFHpA* | 52.40 | 0.47 | 1.9 |
| PFHxA | 29.00 | | NT |
| PFHxS | 0.92 | 4.9 | 2.2 |
| PFNA* | 57.00 | 4.1 | 5.4 |
| PFOA* | 172.00 | 1.9 | 15 |
| PFOS | 848.00 | 13 | 91 |
| Total PFAS | 1132 | | 115.61 |

213.    Similarly, Plaintiff Susan Ryan's blood was tested on April 26, 2022, and her results showed that she had even higher levels of PFAS concentration than her husband, Thomas Ryan:

| Compound | Water Concentration Levels | Typical Blood PFAS Concentration Levels | Susan Ryan Concentration Levels |
|---|---|---|---|
| PFBS | 1.09 | 0.05 | ND |
| PFDA* | 2.21 | | NT |
| PFHpA* | 52.40 | 0.47 | 1.5 |
| PFHxA | 29.00 | | NT |
| PFHxS | 0.92 | 4.9 | 1.6 |
| PFNA* | 57.00 | 4.1 | 11 |
| PFOA* | 172.00 | 1.9 | 28 |
| PFOS | 848.00 | 13 | 200 |
| Total PFAS | 1132 | | 242.10 |

47

214.    Additionally, on or about June of 2022, Nancy Donovan had her blood tested by Quest Diagnostics and was informed that PFOA was present in her blood at a level of 34 ug/L, and the presence of PFAS was detected at a level of 37.7.

215.    The bioaccumulation that has occurred in Plaintiffs' and Class Members' bodies, as evidenced by, *inter alia*, Plaintiffs Thomas Ryan's, Susan Ryan's, and Nancy Donovan's blood test results detailed above, is a subcellular physiological change that has occurred as a result of Defendants' conduct. Further, these subcellular changes indicate that Plaintiffs and Class Members are at increased risk of developing dangerous and deadly diseases.

c.    <u>DEFENDANTS' CONDUCT SUBSTANTIALLY AND UNREASONABLY INTERFERED WITH PLAINTIFFS' ABILITY TO ENJOY THEIR PROPERTY.</u>

216.    Defendants' creation, disposal, storage, and/or distribution of PFAS-contaminated waste products has injured the Plaintiffs' and the Class Member's enjoyment and quality of life.

217.    The Plaintiffs' and the Class Members' use and enjoyment of their property have been substantially and unreasonably impaired by Defendants' conduct. Owners of properties where the water supply and soil have been contaminated, including Plaintiffs and the Class Members, can no longer use their natural water sources for drinking, cooking, or other ordinary household uses. In addition, Plaintiffs and the Class Members cannot eat the fruits and vegetables from their gardens or the eggs produced by their chickens.

218.    Moreover, the Plaintiffs and the Class Members have suffered diminution of the value of their homes and properties and an impaired ability to sell their PFAS-contaminated homes and properties.

V.      PLAINTIFF ALLEGATIONS

a.   THE RYAN PLAINTIFFS

219.    Plaintiff Thomas Ryan and Plaintiff Susan Ryan (collectively, the "Ryan Plaintiffs") moved to Westminster to enjoy a healthier lifestyle, which included open space, clean air and water, and cultivating and eating food grown on their own land.

220.    The Ryan Plaintiffs purchased and currently own a residential property and home (the "Ryan Property") on Bean Porridge Hill Road across from the MassNatural operations located on the Otter Farm Property.

221.    PFAS-contaminated MassNatural topshelf loam was used during construction of the homesite on the Ryan Property, resulting in PFAS contamination of soil and water on the Ryan Property.

222.    PFAS has migrated from the operations of MassNatural on the Otter Farm property through runoff and groundwater, including the underground water supply to the Ryan Property.

223.    The Ryan Plaintiffs purchased and used additional topshelf loam from MassNatural in connection with a land reclamation project performed on the Ryan Property after they acquired ownership of the property.

224.    The soil and drinking water on the Ryan Property are contaminated with PFAS. Testing of soil and water on the Ryan Property has revealed dangerous levels PFAS contamination.

a.   THE GALLAGHER PLAINTIFFS

225.    Plaintiffs Sean Gallagher and Ashley Sultan Gallagher (collectively, the "Gallagher Plaintiffs") purchased and currently own a residential property and home in

49

Westminster across Bean Porridge Hill Road from the MassNatural operations at Otter Farm (the "Gallagher Property").

226.    PFAS-contaminated MassNatural topshelf loam was used during construction of the homesite on the Gallagher Property, resulting in the contamination of soil and water on the Gallagher Property.

227.    PFAS also has migrated from the operations of MassNatural on the Otter Farm property through runoff and groundwater, including the underground water supply to the Gallagher Property.

a.    <u>PLAINTIFF BURT</u>

228.    Plaintiff Michele Burt is a resident of Westminster, Massachusetts with a mailing zip code of 01473. Ms. Burt has owned her home since 2003 and she and her family have consumed and ingested water from a private well on their property since that time.

229.    Lessard tested water from Ms. Burt's active well and determined that PFAS were present at 133.7 ppt. An independent test performed by Chem Serv and paid for by Ms. Burt at her own expense determined that PFAS were present at 158 ppt.

230.    On June 28, 2022, a contractor hired by Lessard installed a Point-of-Entry Treatment (POET) system on Ms. Burt's private well. Ms. Burt will require use of the POET indefinitely to filter PFAS from her water.

231.    Because of those exposures, Ms. Burt is at an increased risk for a variety of adverse health outcomes due to exposure to PFAS. Ms. Burt's residential property has lost value since discovery of PFAS contamination.

a.   <u>PLAINTIFF DONOVAN</u>

232.    Plaintiff Nancy Donovan is a resident of Westminster, Massachusetts with a mailing zip code of 01473. Ms. Donovan has owned her home since 1998 and she and her family have consumed and ingested water from a private well.

233.    Lessard tested water from Ms. Donovan's well and determined that PFAS were present at 165 ppt. An independent test performed by Chem Serv and paid for by Ms. Donovan at her own expense determined that PFAS were present at 188 ppt.

234.    On or about June of 2022, a contractor hired by Lessard installed a Point-of-Entry Treatment (POET) system on Ms. Donovan's private well. Ms. Donovan will require the use of the POET system indefinitely to filter PFAS from her water.

235.    Because of those exposures, Ms. Donovan is at an increased risk for a variety of adverse health outcomes due to exposure to PFAS. Ms. Donovan's residential property has lost value since the discovery of PFAS contamination.

a.   <u>PLAINTIFF LADUE</u>

236.    Plaintiff Lauren Ladue is currently a resident of Shrewsbury, Massachusetts. Ms. Ladue was at all times relevant hereto a resident of Westminster, Massachusetts with a mailing zip code of 01473. Ms. Ladue lived in her family home in Westminster from 2003 until November 2024 and she and her family consumed and ingested water from a private well during that time. Ms. Ladue is a woman of childbearing age.

237.    Lessard tested water from the well at Ms. Ladue's Westminster residence and determined that PFAS were present at 324 ppt.

238.    In June, 2022, a contractor hired by Lessard installed a Point-of- Entry Treatment (POET) system on Ms. Ladue's private well. Ms. Ladue's parents' home will require the use of the POET indefinitely to filter PFAS from their water.

239.    Because of those exposures, Ms. Ladue is at an increased risk for a variety of adverse health outcomes due to exposure to PFAS.

240.    <u>CLASS ALLEGATIONS</u>

241.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of themselves and the following individuals (collectively, the "Class"):

> **(1) Property Damage Class (Groundwater):** All persons who are or were owners of real property on or after January 31, 2022, which property is within the Study Area.

> **(2) Property Damage Class (Compost and Soil):** All persons who are or were owners of real property on or after January 31, 2022, which property contains compost, loam, or soil that was purchased from MassNatural and is contaminated with PFAS.
> **(3) Consumer Subclass:** All persons who have purchased contaminated compost products from MassNatural during the Class Period.

> **(4) Medical Monitoring Class:** All persons who resided at a home within the Study Area between 1987 and present, and ingested water from the well supplying water to that home contaminated by PFAS, or any natural child born to a resident who meets and/or met these criteria at the time of the child's birth.

242.    Plaintiffs reserve the right to expand, narrow or otherwise modify or refine the definition of the Classes based on additional information obtained through further investigation and discovery, and/or to address or accommodate any of the Court's manageability concerns.

243.    **Ascertainability**. The proposed Classes are readily ascertainable because they are defined using objective criteria, to allow class members to determine if they are part of the

Classes. Further, the members of the Classes can be readily identified through records and information in Defendants' possession, custody or control.

244. **Numerosity**. The Classes are so numerous and geographically dispersed that joinder of individual members is impracticable. The exact number of members of the Classes, as herein identified and described, is not known to Plaintiffs at this time and can only be ascertained through appropriate discovery, but given the testing, test results, and conclusions performed and reported by MassDEP about the nature and extent of PFAS contamination, Plaintiffs believe that there are at least hundreds of class members.

245. **Commonality and Predominance**. Common questions of fact and law exist for each cause of action and predominate over questions solely affecting individual members of the Classes, including the following:

    a. Whether Defendants designed, manufactured, and/or sold PFAS;
    b. Whether Defendants designed, manufactured, transported, and/or disposed of waste products containing PFAS at MassNatural;
    c. Whether Defendants released PFAS at MassNatural;
    d. Whether and for how long Defendants knew, or should have known, of the release of PFAS at MassNatural;
    e. Whether Defendants owed and breached a duty of care to Plaintiffs by allowing PFAS to be released into the groundwater surrounding MassNatural;
    f. Whether Defendants owed and breached a duty of care to Plaintiffs and the Classes to act reasonably to remediate, contain, and eliminate PFAS contamination before it injured the properties of members of the Classes;
    g. Whether Defendants' release of PFAS into Plaintiffs' properties and bodies is an objectively unreasonably interference with Plaintiffs' use and enjoyment of their properties;
    h. Whether Defendants' contamination of Plaintiffs' properties, drinking water wells, and bodies has caused subcellular change in Plaintiffs that substantially increased the risk of serious disease, illness, or injury;
    i. Whether effective medical tests for reliable early detection of the serious disease, illness, or injury Plaintiffs are at increased risk of developing exist;
    j. Whether Defendants owed and breached a duty of care to Plaintiffs by selling PFAS-contaminated products to Plaintiffs; and
    k. Whether early detection of the serious diseases, illness, and injuries Plaintiffs are at increased risk of developing, combined with prompt and effective

treatment, will lower the risk of death or the severity of the disease, illness or injury.

246.    **Typicality**. Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs and the members of the Classes sustained damages arising out of Defendants' common course of conduct as described in this Complaint. The injuries of Plaintiffs and each member of the Classes were directly caused by Defendants' wrongful conduct, and Plaintiffs and the members of the Classes assert similar claims for relief.

247.    **Adequacy**. Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Classes. Plaintiffs have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs have no interest that is antagonistic to those of the Classes, and Defendants have no known defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Classes, and they have the resources to do so. Neither Plaintiffs nor Plaintiffs' counsel has any interest adverse to those of the other members of the Classes.

248.    **Substantial Benefits**. This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Classes is impracticable. This proposed class action is manageable. Plaintiffs know of no special difficulty to be encountered in the maintenance of the action that would preclude its maintenance as a class action.

CLAIMS FOR RELIEF

FIRST CLAIM FOR RELIEF
MEDICAL MONITORING
(Against Defendant Ball)

249.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

250.    Plaintiffs and Class Members have been actually and significantly exposed to dangerous levels of PFAS, exceeding the levels deemed dangerous by the MassDEP and which are far higher than normal background levels. As is reported by the EPA, PFAS are dangerous, hazardous, toxic substances that have been proven to cause disease and illness in humans, including but not limited to certain kidney and reproductive cancers.

251.    Plaintiffs' and the Class Members' actual and significant exposure to these dangerous levels of PFAS is the direct and proximate result of Defendant Ball's intentional, willful, wanton, reckless and/or negligent conduct in connection with Defendant Ball's disposal of waste materials contaminated with PFAS chemicals at MassNatural's operations at Otter Farm.

252.    As a direct and proximate result of Defendant's intentional, willful, wanton, reckless and/or negligent conduct in connection with disposal of waste materials contaminated with PFAS chemicals at MassNatural's operations at Otter Farm, Plaintiffs and the Class Members have ingested and absorbed PFAS into their bodies, tissue, and cells where it is known to and has bioaccumulated over time. The presence of this manmade foreign substance, PFAS, in their bodies, tissue, and cells represents a manifest change in Plaintiffs' bodies, tissue and cells and leaves Plaintiffs at an increased risk of serious disease, illness, or injury. This is a physiological change in Plaintiffs' bodies occurring at a subcellular level. Some Plaintiffs and

other residents have had their blood tested, and detected the presence of PFAS in their blood above the background level.

253.    Due to these subcellular changes from PFAS exposure, Plaintiffs and the Class Members are at an increased risk of developing cancer and other illnesses, diseases and disease processes, which results in their present medical need for periodic diagnostic medical examinations and monitoring.

254.    Diagnostic testing of Plaintiffs and the Class Members for early detection of cancer and other illnesses, diseases, and disease processes caused by exposure to PFAS chemicals is reasonably and medically necessary to assure early diagnosis and effective treatment of those conditions.

255.    Plaintiffs and the Class Members have suffered the present harm of the need for the cost of diagnostic testing for the early detection of cancer and other illnesses, diseases, and disease processes. As a direct and proximate result of Defendant Ball's intentional, willful, wanton, reckless, and/or negligent acts or omissions in connection with its operations at Otter Farm, specifically the use, storage, emission, discharge, disposal, and/or distribution of PFAS chemicals, Plaintiffs and the Class Members require an award of the cost of a medical monitoring program necessary for early detection and treatment of the onset of illnesses, diseases, and disease processes.

256.    Monitoring procedures exist that make possible the early detection of cancer, the progression of biomarker abnormalities, and other illnesses, diseases, and disease processes resulting from exposure to PFAS. These monitoring procedures will benefit Plaintiffs and the Class Members, and they are different from what would normally be recommended in the

absence of PFAS exposure. Such diagnostic testing is reasonably and medically necessary due to the exposure of Plaintiffs and the Class Members to PFAS caused by Defendants.

257.    Because Plaintiffs' and the Class Members' claims are based solely on the amount of exposure to PFAS caused by Defendants, any alleged alternative exposure, or prior medical or family history, is not a basis for Plaintiffs and the Class Members' claims in this case.

258.    As a result, Plaintiffs and the Class should be awarded the quantifiable costs of such a monitoring regime. Plaintiffs and the Class Members also seek all other available and necessary relief in connection with this claim.

SECOND CLAIM FOR RELIEF
NEGLIGENCE
(Against Defendant Ball)

259.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

260.    Defendant Ball owed Plaintiffs and the Class Members a duty of reasonable care to avoid dumping, emitting, discharging, disposing, and/or distributing materials with high levels of PFAS chemicals in a manner and location that would cause Plaintiffs and the Class Members injury or harm. Plaintiffs and the Class Members were located within the scope of the risk created by Defendant Ball's conduct and they were foreseeable victims of negligent disposal of contaminated waste by Defendant Ball.

261.    Defendant Ball owed Plaintiffs and the Class Members a duty of reasonable care to eliminate or minimize the disposal of PFAS-contaminated waste in a manner and location where it would be expected to leach into the soil, water, and consumer products sold by MassNatural commensurate with the risk of discharging, disposing, and/or distributing PFAS.

262.     Given the likelihood that Defendant Ball was creating PFAS contaminated products and that contamination of land and water that would result in exposure of Westminster to PFAS thus increasing the risk that those residents would develop significant illnesses or diseases, Defendant Ball also had a duty to use reasonable care to avoid, minimize, or warn about its use, emission, discharge, disposal, and/or distribution of materials containing high levels of PFAS.

263.     Defendant Ball breached its duty to use reasonable care in one or more of the following ways:

    a.  By negligently failing to use reasonable care to test and/or screen materials it was dumping or otherwise disposing of at MassNatural's operations at Otter Farm to ensure it was not disposing of materials that would be likely to contaminate soil, groundwater, and consumer products at Otter Farm;

    b.  By negligently dumping PFAS-contaminated operations at Otter Farm without taking reasonable steps to prevent or minimize the accumulation and emission of PFAS chemicals into the soil, groundwater, and consumer products at Otter Farm;

    c.  By negligently failing to employ safe methods of disposal to adequately prevent, control or eliminate PFAS discharge into the environment;

    d.  By negligently failing to institute proper procedures and training to prevent, minimize, and/or promptly and effectively respond to the release of PFAS from its waste products into the environment;

    e.  By negligently failing to promptly and effectively respond to its release of PFAS into the environment;

f.  By negligently failing to dispose of its contaminated manufacturing waste in a safer, unpopulated or much less populated area and/or by negligently discharging dangerous amounts of PFAS into land and groundwater near a populated community; and

g.  By negligently failing to warn MassNatural and/or current and potential neighboring residents and property owners near Otter Farm that they were being exposed to PFAS and of the consequent risks of disease the residents acquired because of that exposure.

264.  As a direct and proximate result of Defendant Ball's negligence, Plaintiffs and the Class Members have suffered, presently suffer, and will continue to suffer, real property damage, out of pocket expenses, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, upset, aggravation, and inconvenience.

265.  Defendant Ball is liable to Plaintiffs and the Class Members for fair compensation for the resulting injuries, which includes pain and suffering, reasonable expenses incurred for medical care and nursing in the treatment and cure of the injury, diminution in earning capacity, and pain and suffering and such medical expenses and diminution in earning capacity as are shown to be reasonably probable to continue in the future.

### THIRD CLAIM FOR RELIEF
PRIVATE NUISANCE
(Against Defendant Ball)

266.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

267.    At all relevant times, Defendant Ball knew or should have known PFAS chemicals were hazardous and harmful to real property, water, and human beings, and it was substantially certain that the method and manner of Defendant Ball's disposal of materials contaminated with PFAS at MassNatural's business at Otter Farm would cause injuries and property damage to Plaintiffs and the Class Members.

268.    Defendant Ball, through the negligent, reckless and/or intentional conduct as alleged in this Complaint, have caused contamination with PFAS of real property owned and/or possessed by Plaintiffs and the Class Members.

269.    Defendant Ball created a hazardous condition or activity on property at Otter Farm that caused substantial, unreasonable, and foreseeable interference with Plaintiffs' and the Class Members' use and enjoyment of their property. Defendant Ball's interference has caused and is causing Plaintiffs and the Class Members to, among other things, refrain from using their land to cultivate and grow fruit, vegetables, and other food and to use their water to drink, cook, or bathe, resulting in significant inconvenience and expense.

270.    By causing contamination with PFAS of real property owned and/or possessed by Plaintiffs and the Class Members, Defendant Ball also has substantially interfered otherwise with the Plaintiffs' and Class Members' ability to enjoy their property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that each Class Member chooses.

271.    Defendant Ball's conduct was intentional, negligent, reckless, and ultrahazardous and its conduct constitutes a continuous invasion of the property rights of Plaintiffs and the Class Members.

272.    As a direct and proximate result of Defendant Ball's dumping, disposal, and/or distribution of PFAS at Otter Farm and the resulting exposure of the persons and/or property of Plaintiffs and the Class Members to PFAS resulting from the conduct of the Defendant Ball, Plaintiffs and the Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation, trauma, and inconvenience.

273.    Plaintiffs and the Class Members are therefore entitled to damages, costs, and a judgment that the nuisance be abated and removed.

## FOURTH CLAIM FOR RELIEF
### PUBLIC NUISANCE
(Against Defendant Ball)

274.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

275.    At all relevant times, Defendant Ball knew or should have known PFAS to be hazardous and harmful to real property and human beings, and it was substantially certain that its use, emission, discharge, disposal, and/or distribution of materials containing PFAS at Otter Farm would cause injuries and losses to the persons and property of Plaintiffs and the Class Members.

276.    Plaintiffs, the Class Members, and members of the public have a common right to enjoy their real property free of dangerous contamination of their land and water and to live their lives without exposure to unreasonable levels of toxic PFAS chemicals.

277.    Defendant Ball's conduct in arranging for the transport, dumping, and disposal of PFAS-contaminated materials at Otter Farm—deemed hazardous material under Massachusetts law—has contaminated groundwater that supplies water to Plaintiffs, the Class Members, and the public and substantially and unreasonably infringes upon and transgresses the public right of Plaintiffs, the Class Members, and members of the public to enjoy their real property.

278.    Defendant Ball knew or should have known that the materials containing PFAS that it dumped, discharged, and disposed of at Otter Farm would have a deleterious effect upon the health, safety, and well-being of people living near Otter Farm, including Plaintiffs and the Class Members.

279.    Defendant Ball's use, emission, discharge, disposal, and/or distribution of materials containing PFAS at Otter Farm caused those who owned and/or lived on nearby properties, including Plaintiffs and the Class Members, to come into contact with high levels of PFAS on a routine and constant basis, causing substantially elevated risks of health problems resulting from exposure to dangerous levels of PFAS, as well as property damage and diminished property values.

280.    As a direct and proximate result of Defendant Ball's use, emission, discharge, disposal, and/or distribution of materials containing PFAS chemicals at the Otter Farm Property, Plaintiffs' and the Class Members' common right to live free of dangerous, toxic substances was eliminated and/or severely diminished.

281.     As a direct and proximate result of Defendant Ball's use, emission, discharge, disposal, and/or distribution of materials containing PFAS at Otter Farm, PFAS chemicals contaminated the land and water owned, possessed, and/or used by Plaintiffs and the Class Members, thereby exposing their bodies to PFAS.

282.     As a direct and proximate result of Defendant Ball's use, emission, discharge, disposal, and/or distribution of materials containing PFAS at Otter Farm, Plaintiffs and the Class Members will be forced to pay for the private removal of contaminants from their property emanating from pollution of public water sources.

283.     As a direct and proximate result of Defendant Ball's use, emission, discharge, disposal, and/or distribution of materials containing PFAS at Otter Farm and the resulting exposure of Plaintiffs and the Class Members to PFAS, Plaintiffs and the Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expenses, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation, trauma, and inconvenience.

FIFTH CLAIM FOR RELIEF
WILLFUL AND WANTON CONDUCT
(Against Defendant Ball)

284.     Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

285.     At all times relevant, Defendant Ball owed a duty to refrain from willful, wanton, reckless, and/or outrageous conduct and/or conduct that exhibited an utter indifference to and/or conscious disregard of the health, safety, and well-being of Plaintiffs and the Class Members.

286.    Defendant Ball at all relevant times was aware of the considerable health risks associated with the discharge of PFAS into soil, groundwater, and consumer products, including the risk of causing various forms of cancer to those exposed by PFAS from soil, water, or other exposures.

287.    Defendant Ball at all relevant times knew that its use, emission, discharge, disposal, and/or distribution of materials containing PFAS or likely to contain PFAS would be likely to result in the emission of unreasonably dangerous levels of PFAS into the soil and groundwater in a manner that would be likely to cause significant financial and personal injury to Plaintiffs and the Class Members.

288.    Notwithstanding this knowledge, Defendant Ball acted in a manner that was intentional, willful, wanton, reckless, outrageous, and/or demonstrated an indifference to and/or conscious disregard of the health, safety, and well-being of Plaintiffs and the Class Members by, among other things:

      a.    Failing to test and/or screen materials it was dumping or disposing of at Otter Farm, when it knew doing so was required to ensure safe composting without the substantial risk of contaminating soil, groundwater, and its consumer products;

      b.    Failing to take reasonable steps to prevent or minimize the accumulation and emission of PFAS chemicals in materials it dumped or disposed of at Otter Farm, into the soil, when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

c.  Dumping and/or disposing of PFAS-contaminated waste products at Otter Farm, despite knowing that doing so would likely cause PFAS contamination and the resulting significant financial and/or personal injury to Plaintiffs, the Class Members, and/or the Consumer Subclass;

d.  Failing to employ safe methods of operation to adequately prevent, control or eliminate PFAS discharge into the environment when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

e.  Failing to institute proper procedures and training to prevent, minimize, and/or promptly and effectively respond to its release of PFAS into the environment when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

f.  Failing to promptly and effectively respond to its release of PFAS into the environment when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

g.  Failing to warn Plaintiffs and the Class Members of its use, emission, discharge, disposal, and/or distribution of materials containing PFAS at Otter Farm, when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

h.  Failing to ensure it was dumping or disposing of its waste products in an unpopulated or much less populated area when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

     i.   Discharging dangerous amounts of PFAS into land and groundwater near a populated community, when it knew doing so would likely cause significant financial and/or personal injury to Plaintiffs and the Class Members; and

     j.   Failing to warn current and potential neighboring residents and property owners that they were being exposed to PFAS and of the consequent risks of disease the residents acquired because of that exposure when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members.

289.    As a direct and proximate result of the Defendant Ball's willful, wanton, and reckless conduct, Plaintiffs and the Class Members have suffered, presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation, and inconvenience.

<u>SIXTH CLAIM FOR RELIEF</u>
MEDICAL MONITORING
(Against Defendant Rust-Oleum)

290.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

291.    Plaintiffs and Class Members have been actually and significantly exposed to dangerous levels of PFAS, exceeding the levels deemed dangerous by the MassDEP and which are far higher than normal background levels. As is reported by the EPA, PFAS are dangerous, hazardous, toxic substances that have been proven to cause disease and illness in humans, including but not limited to certain kidney and reproductive cancers.

292.    Plaintiffs' and the Class Members' actual and significant exposure to these dangerous levels of PFAS is the direct and proximate result of Defendant Rust-Oleum's intentional, willful, wanton, reckless and/or negligent conduct in connection with Defendant Rust-Oleum's disposal of waste materials contaminated with PFAS chemicals at MassNatural's operations at Otter Farm.

293.    As a direct and proximate result of Defendant's intentional, willful, wanton, reckless and/or negligent conduct in connection with disposal of waste materials contaminated with PFAS chemicals at MassNatural's operations at Otter Farm, Plaintiffs and the Class Members have ingested and absorbed PFAS into their bodies, tissue, and cells where it is known to and has bioaccumulated over time. The presence of this manmade foreign substance, PFAS, in their bodies, tissue, and cells represents a manifest change in Plaintiffs' bodies, tissue and cells and leaves Plaintiffs at an increased risk of serious disease, illness, or injury. This is a physiological change in Plaintiffs' bodies occurring at a subcellular level. Some Plaintiffs and other residents have had their blood tested, and detected the presence of PFAS in their blood above the background level.

294.    Due to these subcellular changes from PFAS exposure, Plaintiffs and the Class Members are at an increased risk of developing cancer and other illnesses, diseases and disease processes, which results in their present medical need for periodic diagnostic medical examinations and monitoring.

295.    Diagnostic testing of Plaintiffs and the Class Members for early detection of cancer and other illnesses, diseases, and disease processes caused by exposure to PFAS chemicals is reasonably and medically necessary to assure early diagnosis and effective treatment of those conditions.

296.    Plaintiffs and the Class Members have suffered the present harm of the need for the cost of diagnostic testing for the early detection of cancer and other illnesses, diseases, and disease processes. As a direct and proximate result of Defendant Rust-Oleum's intentional, willful, wanton, reckless, and/or negligent acts or omissions in connection with its operations at Otter Farm, specifically the use, storage, emission, discharge, disposal, and/or distribution of PFAS chemicals, Plaintiffs and the Class Members require an award of the cost of a medical monitoring program necessary for early detection and treatment of the onset of illnesses, diseases, and disease processes.

297.    Monitoring procedures exist that make possible the early detection of cancer, the progression of biomarker abnormalities, and other illnesses, diseases, and disease processes resulting from exposure to PFAS. These monitoring procedures will benefit Plaintiffs and the Class Members, and they are different from what would normally be recommended in the absence of PFAS exposure. Such diagnostic testing is reasonably and medically necessary due to the exposure of Plaintiffs and the Class Members to PFAS caused by Defendants.

298.    Because Plaintiffs' and the Class Members' claims are based solely on the amount of exposure to PFAS caused by Defendants, any alleged alternative exposure, or prior medical or family history, is not a basis for Plaintiffs and the Class Member's claims in this case.

299.    As a result, Plaintiffs and the Class should be awarded the quantifiable costs of such a monitoring regime. Plaintiffs and the Class Members also seek all other available and necessary relief in connection with this claim.

SEVENTH CLAIM FOR RELIEF
NEGLIGENCE
(Against Defendant Rust-Oleum)

300. Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

301. Defendant Rust-Oleum owed Plaintiffs and the Class Members a duty of reasonable care to avoid dumping, emitting, discharging, disposing, and/or distributing materials with high levels of PFAS chemicals in a manner and location that would cause Plaintiffs and the Class Members injury or harm. Plaintiffs and the Class Members were located within the scope of the risk created by Defendant Rust-Oleum's conduct and they were foreseeable victims of negligent disposal of contaminated waste by Defendant Rust-Oleum.

302. Defendant Rust-Oleum owed Plaintiffs and the Class Members a duty of reasonable care to eliminate or minimize the disposal of PFAS-contaminated waste in a manner and location where it would be expected to leach into the soil, water, and consumer products sold by MassNatural commensurate with the risk of discharging, disposing, and/or distributing PFAS.

303. Given the likelihood that Defendant Rust-Oleum was creating PFAS contaminated products and that contamination of land and water that would result in exposure of Westminster to PFAS thus increasing the risk that those residents would develop significant illnesses or diseases, Defendant Rust-Oleum also had a duty to use reasonable care to avoid, minimize, or warn about its use, emission, discharge, disposal, and/or distribution of materials containing high levels of PFAS.

304. Defendant Rust-Oleum breached its duty to use reasonable care in one or more of the following ways:

a. By negligently failing to use reasonable care to test and/or screen materials it was dumping or otherwise disposing of at MassNatural's operations at Otter Farm to ensure it was not disposing of materials that would be likely to contaminate soil, groundwater, and consumer products at Otter Farm;

b. By negligently dumping PFAS-contaminated operations at Otter Farm without taking reasonable steps to prevent or minimize the accumulation and emission of PFAS chemicals into the soil, groundwater, and consumer products at Otter Farm;

c. By negligently failing to employ safe methods of disposal to adequately prevent, control or eliminate PFAS discharge into the environment;

d. By negligently failing to institute proper procedures and training to prevent, minimize, and/or promptly and effectively respond to the release of PFAS from its waste products into the environment;

e. By negligently failing to promptly and effectively respond to its release of PFAS into the environment;

f. By negligently failing to dispose of its contaminated manufacturing waste in a safer, unpopulated or much less populated area and/or by negligently discharging dangerous amounts of PFAS into land and groundwater near a populated community; and

g. By negligently failing to warn MassNatural and/or current and potential neighboring residents and property owners near Otter Farm that they were being exposed to PFAS and of the consequent risks of disease the residents acquired because of that exposure.

70

305.    As a direct and proximate result of Defendant Rust-Oleum's negligence, Plaintiffs and the Class Members have suffered, presently suffer, and will continue to suffer, real property damage, out of pocket expenses, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, upset, aggravation, and inconvenience.

306.    Defendant Rust-Oleum is liable to Plaintiffs and the Class Members for fair compensation for the resulting injuries, which includes pain and suffering, reasonable expenses incurred for medical care and nursing in the treatment and cure of the injury, diminution in earning capacity, and pain and suffering and such medical expenses and diminution in earning capacity as are shown to be reasonably probable to continue in the future.

<u>EIGHTH CLAIM FOR RELIEF</u>
PRIVATE NUISANCE
(Against Defendant Rust-Oleum)

307.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

308.    At all relevant times, Defendant Rust-Oleum knew or should have known PFAS chemicals were hazardous and harmful to real property, water, and human beings, and it was substantially certain that the method and manner of Defendant Rust-Oleum's disposal of materials contaminated with PFAS at MassNatural's business at Otter Farm would cause injuries and property damage to Plaintiffs and the Class Members.

309.    Defendant Rust-Oleum, through the negligent, reckless and/or intentional conduct as alleged in this Complaint, have caused contamination with PFAS of real property owned and/or possessed by Plaintiffs and the Class Members.

71

310.    Defendant Rust-Oleum created a hazardous condition or activity on property at Otter Farm that caused substantial, unreasonable, and foreseeable interference with Plaintiffs' and the Class Members' use and enjoyment of their property. Defendant Rust-Oleum's interference has caused and is causing Plaintiffs and the Class Members to, among other things, refrain from using their land to cultivate and grow fruit, vegetables, and other food and to use their water to drink, cook, or bathe, resulting in significant inconvenience and expense.

311.    By causing contamination with PFAS of real property owned and/or possessed by Plaintiffs and the Class Members, Defendant Rust-Oleum also has substantially interfered otherwise with the Plaintiffs' and Class Members' ability to enjoy their property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that each Class Member chooses.

312.    Defendant Rust-Oleum's conduct was intentional, negligent, reckless, and ultrahazardous and its conduct constitutes a continuous invasion of the property rights of Plaintiffs and the Class Members.

313.    As a direct and proximate result of Defendant Rust-Oleum's dumping, disposal, and/or distribution of PFAS at Otter Farm and the resulting exposure of the persons and/or property of Plaintiffs and the Class Members to PFAS resulting from the conduct of the Defendant Rust-Oleum, Plaintiffs and the Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation, trauma, and inconvenience.

314.    Plaintiffs and the Class Members are therefore entitled to damages, costs, and a judgment that the nuisance be abated and removed.

## NINTH CLAIM FOR RELIEF
PUBLIC NUISANCE
(Against Defendant Rust-Oleum)

315.     Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

316.     At all relevant times, Defendant Rust-Oleum knew or should have known PFAS to be hazardous and harmful to real property and human beings, and it was substantially certain that its use, emission, discharge, disposal, and/or distribution of materials containing PFAS at Otter Farm would cause injuries and losses to the persons and property of Plaintiffs and the Class Members.

317.     Plaintiffs, the Class Members, and members of the public have a common right to enjoy their real property free of dangerous contamination of their land and water and to live their lives without exposure to unreasonable levels of toxic PFAS chemicals.

318.     Defendant Rust-Oleum's conduct in arranging for the transport, dumping, and disposal of PFAS-contaminated materials at Otter Farm—deemed hazardous material under Massachusetts law—has contaminated groundwater that supplies water to Plaintiffs, the Class Members, and the public and substantially and unreasonably infringes upon and transgresses the public right of Plaintiffs, the Class Members, and members of the public to enjoy their real property.

319.     Defendant Rust-Oleum knew or should have known that the materials containing PFAS that it dumped, discharged, and disposed of at Otter Farm would have a deleterious effect upon the health, safety, and well-being of people living near Otter Farm, including Plaintiffs and the Class Members.

73

320.    Defendant Rust-Oleum's use, emission, discharge, disposal, and/or distribution of materials containing PFAS at Otter Farm caused those who owned and/or lived on nearby properties, including Plaintiffs and the Class Members, to come into contact with high levels of PFAS on a routine and constant basis, causing substantially elevated risks of health problems resulting from exposure to dangerous levels of PFAS, as well as property damage and diminished property values.

321.    As a direct and proximate result of Defendant Rust-Oleum's use, emission, discharge, disposal, and/or distribution of materials containing PFAS chemicals at the Otter Farm Property, Plaintiffs' and the Class Members' common right to live free of dangerous, toxic substances was eliminated and/or severely diminished.

322.    As a direct and proximate result of Defendant Rust-Oleum's use, emission, discharge, disposal, and/or distribution of materials containing PFAS at Otter Farm, PFAS chemicals contaminated the land and water owned, possessed, and/or used by Plaintiffs and the Class Members, thereby exposing their bodies to PFAS.

323.    As a direct and proximate result of Defendant Rust-Oleum's use, emission, discharge, disposal, and/or distribution of materials containing PFAS at Otter Farm, Plaintiffs and the Class Members will be forced to pay for the private removal of contaminants from their property emanating from pollution of public water sources.

324.    As a direct and proximate result of Defendant Rust-Oleum's use, emission, discharge, disposal, and/or distribution of materials containing PFAS at Otter Farm and the resulting exposure of Plaintiffs and the Class Members to PFAS, Plaintiffs and the Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expenses, personal property damage, loss of use and enjoyment of property, diminution in

property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation, trauma, and inconvenience.

<u>TENTH CLAIM FOR RELIEF</u>
WILLFUL AND WANTON CONDUCT
(Against Defendant Rust-Oleum)

325.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

326.    At all times relevant, Defendant Rust-Oleum owed a duty to refrain from willful, wanton, reckless, and/or outrageous conduct and/or conduct that exhibited an utter indifference to and/or conscious disregard of the health, safety, and well-being of Plaintiffs and the Class Members.

327.    Defendant Rust-Oleum at all relevant times was aware of the considerable health risks associated with the discharge of PFAS into soil, groundwater, and consumer products, including the risk of causing various forms of cancer to those exposed by PFAS from soil, water, or other exposures.

328.    Defendant Rust-Oleum at all relevant times knew that its use, emission, discharge, disposal, and/or distribution of materials containing PFAS or likely to contain PFAS would be likely to result in the emission of unreasonably dangerous levels of PFAS into the soil and groundwater in a manner that would be likely to cause significant financial and personal injury to Plaintiffs and the Class Members.

329.    Notwithstanding this knowledge, Defendant Rust-Oleum acted in a manner that was intentional, willful, wanton, reckless, outrageous, and/or demonstrated an indifference to and/or conscious disregard of the health, safety, and well-being of Plaintiffs and the Class Members by, among other things:

a. Failing to test and/or screen materials it was dumping or disposing of at Otter Farm, when it knew doing so was required to ensure safe composting without the substantial risk of contaminating soil, groundwater, and its consumer products;

b. Failing to take reasonable steps to prevent or minimize the accumulation and emission of PFAS chemicals in materials it dumped or disposed of at Otter Farm, into the soil, when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

c. Dumping and/or disposing of PFAS-contaminated waste products at Otter Farm, despite knowing that doing so would likely cause PFAS contamination and the resulting significant financial and/or personal injury to Plaintiffs, the Class Members, and/or the Consumer Subclass;

d. Failing to employ safe methods of operation to adequately prevent, control or eliminate PFAS discharge into the environment when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

e. Failing to institute proper procedures and training to prevent, minimize, and/or promptly and effectively respond to its release of PFAS into the environment when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

    f.   Failing to promptly and effectively respond to its release of PFAS into the environment when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

    g.   Failing to warn Plaintiffs and the Class Members of its use, emission, discharge, disposal, and/or distribution of materials containing PFAS at Otter Farm, when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

    h.   Failing to ensure it was dumping or disposing of its waste products in an unpopulated or much less populated area when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

    i.   Discharging dangerous amounts of PFAS into land and groundwater near a populated community, when it knew doing so would likely cause significant financial and/or personal injury to Plaintiffs and the Class Members; and

    j.   Failing to warn current and potential neighboring residents and property owners that they were being exposed to PFAS and of the consequent risks of disease the residents acquired because of that exposure when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members.

330.   As a direct and proximate result of the Defendant Rust-Oleum's willful, wanton, and reckless conduct, Plaintiffs and the Class Members have suffered, presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss

of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation, and inconvenience.

## ELEVENTH CLAIM FOR RELIEF
### MEDICAL MONITORING
(Against The DuPont Entities)

331.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

332.    As a direct and proximate cause of Defendants The DuPont Entities' negligent conduct, including discharges of hazardous substances and contaminants into the environment, Plaintiffs have been exposed to hazardous levels of PFAS through their well water.

333.    As a result of hazardous levels of PFAS on their properties including in their wells, Plaintiffs' have ingested and absorbed PFAS into their bodies, tissue and cells where it is known to and has bio accumulated over time. The presence of this manmade foreign substance, PFAS, in their bodies, tissue and cells represents a manifest change in Plaintiffs bodies, tissue and cells and leaves Plaintiffs at an increased risk of serious disease, illness, or injury. This is a physiological change in Plaintiffs' bodies occurring at a subcellular level. Some Plaintiffs and other residents have had their blood tested, and detected the presence of PFAS in their blood above the background level of 1.86 ug/L.

334.    Medical testing presently exists for serious diseases, illnesses and injuries associated with exposure to and the presence of PFAS in the human body. Early detection, combined with prompt and effective treatment, will significantly decrease the risk of death or the severity of disease, illness or injury for all putative medical monitoring class members. Such testing is not routinely performed in the absence of the known exposure to PFAS, but conforms with the standard of medical and scientific care when such exposures are known.

335.    A medical monitoring program will allow for early detection and prompt and effective treatment of any serious disease, illness, or injury caused by PFAS exposure. A medical monitoring program will save lives, decrease the severity of illness, decrease the impact of illness on lives and families, and reduce the costs associated with caring for such illnesses, and are periodically necessary.

336.    The present value of the reasonable cost of such tests now and into the future can be calculated and known with reasonable certainty after further discovery is made. Comparable programs, including programs approved by Courts in this and neighboring states have seen costs in excess $13,000 per eligible class member.

TWELFTH CLAIM FOR RELIEF
NEGLIGENCE
(Against The DuPont Entities)

337.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

338.    Defendants The DuPont Entities knew or should have known that the use of PFAS and/or discharge of PFAS and other toxins into the air, soil, groundwater and drinking or household water are hazardous to human health and the environment.

339.    Defendants The DuPont Entities further knew or should have known that it was unsafe and/or unreasonably dangerous to discharge PFAS and other toxins into the environment near surrounding residential communities, including Plaintiffs' residences.

340.    Defendants The DuPont Entities had a duty to warn users of its PFAS and other relevant products of the dangers of releasing PFAS and other toxins into the environment.

341.    Defendants The DuPont Entities breached the above-stated duty by failing to adequately warn and provide sufficient instructions to purchasers such as non-parties Seaman

Paper, Newark and other Defendants to avoid discharging PFAS and other toxins into the environment where it was likely to enter the environment including soil, air, and water (including groundwater) and be inhaled, absorbed and/or ingested by residents including Plaintiffs and others in the surrounding communities.

342.    Defendants The DuPont Entities further breached a duty by neglecting to inform itself of the improper way its purchasers, including the other Defendants and non-party dumpers mishandled highly toxic DuPont products.

343.    As a direct and proximate result of these acts and omissions, Defendants The DuPont Entities wrongfully caused the environment to be contaminated with PFAS and other toxins, thereby exposing Plaintiffs to these chemicals and substances, and causing injury as described above.

344.    Defendants The DuPont Entities contributed to the contamination of the environment with PFAS and other harmful substances, and subsequently contributed to Plaintiffs' exposure to these chemicals, thereby causing injury to them.

345.    The acts and omissions of Defendants The DuPont Entities were negligent. As a result, Plaintiffs have suffered and/or will in the future suffer damage in the form of bodily injuries, emotional distress, economic loss, medical expenses and otherwise, for which Defendants The DuPont Entities is liable.

## THIRTEENTH CLAIM FOR RELIEF
## BREACH OF WARRANTY FOR FAILURE TO WARN
### (Against The DuPont Entities)

346.     Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

347.     Defendants The DuPont Entities developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, and supplied PFAS and other toxins for sale which were incorporated into products manufactured by Defendants Ball and Rust-Oleum, non-parties Seaman Paper, Newark, and other Defendants in the ordinary course of their businesses.

348.     Defendants Ball and Rust-Oleum. non-parties Seaman Paper, Newark, and other Defendants utilized the PFAS chemicals and other toxins supplied by Defendants The DuPont Entities in a reasonably foreseeable and intended manner.

349.     The PFAS and other toxins sold by Defendants The DuPont Entities were unreasonably dangerous to surrounding community residents, including Plaintiffs, without adequate warnings and instructions to prevent discharge of PFAS and other toxins into the environment and accumulation inside the bodies of residents in surrounding communities, including Plaintiffs.

350.     Defendants The DuPont Entities knew or should have known that the PFAS and other toxins they sold would be discharged into the environment and cause contamination of residents' water supply and accumulation in the blood serum and bodily tissues of residents living in the surrounding communities, including Plaintiffs.

351.     Defendants The DuPont Entities failed to advise Plaintiffs as well as Defendants Ball and Rust-Oleum, non-parties MassNatural, Seaman Paper, Otter, Farm, Newark and other Defendants which were purchasers, users or those foreseeably exposed, to their PFAS and other

toxins about the risks these products posed to foreseeable third parties, such as Plaintiffs, and about techniques that could be employed to reduce or eliminate these risks.

352.    Defendants The DuPont Entities had actual knowledge of the health hazards associated with PFAS and other toxins through both animal studies conducted by researchers employed or contracted by such Defendant and though experience with Defendant's own workers, but failed to share such information with purchasers, users or those foreseeably exposed to their products, including Plaintiffs, Defendants Ball and Rust-Oleum, non-parties MassNatural, Seaman Paper, Otter, Farm, Newark and other Defendants or with governmental agencies.

353.    Defendants The DuPont Entities acted with reckless indifference to the health and safety of residents in surrounding communities where its PFAS and other toxins were used by failing to provide adequate warnings of the known dangers of such products when discharged into the environment and ingested by nearby residents, such as Plaintiff.

354.    Defendants The DuPont Entities had a duty to warn users of their PFAS products, and other toxins of the dangers of releasing PFAS and other toxins into the environment.

355.    Defendants The DuPont Entities breached the above-stated duty by failing to adequately warn and provide sufficient instructions to purchasers such as Defendants Ball and Rust-Oleum, non-parties Seaman Paper, Newark, and other Defendants to avoid discharging PFAS and other toxins into the environment where it was likely to enter groundwater and be ingested by residents in surrounding communities, including Plaintiffs.

356.    As a direct and proximate result of Defendants The DuPont Entities' acts and omissions, Plaintiffs have and will continue to suffer damages.

FOURTEENTH CLAIM FOR RELIEF
MEDICAL MONITORING
(Against NEFCO)

357.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

358.    Plaintiffs and Class Members have been actually and significantly exposed to dangerous levels of PFAS, exceeding the levels deemed dangerous by the MassDEP and which are far higher than normal background levels. As is reported by the EPA, PFAS are dangerous, hazardous, toxic substances that have been proven to cause disease and illness in humans, including but not limited to certain kidney and reproductive cancers.

359.    Plaintiffs' and the Class Members' actual and significant exposure to these dangerous levels of PFAS is the direct and proximate result of Defendant NEFCO's intentional, willful, wanton, reckless and/or negligent conduct in connection with Defendant NEFCO's disposal of waste materials contaminated with PFAS chemicals at MassNatural's operations at Otter Farm.

360.    As a direct and proximate result of Defendant's intentional, willful, wanton, reckless and/or negligent conduct in connection with disposal of waste materials contaminated with PFAS chemicals at MassNatural's operations at Otter Farm, Plaintiffs and the Class Members have ingested and absorbed PFAS into their bodies, tissue, and cells where it is known to and has bioaccumulated over time. The presence of this manmade foreign substance, PFAS, in their bodies, tissue, and cells represents a manifest change in Plaintiffs' bodies, tissue and cells and leaves Plaintiffs at an increased risk of serious disease, illness, or injury. This is a physiological change in Plaintiffs' bodies occurring at a subcellular level. Some Plaintiffs and

83

other residents have had their blood tested, and detected the presence of PFAS in their blood above the background level.

361.    Due to these subcellular changes from PFAS exposure, Plaintiffs and the Class Members are at an increased risk of developing cancer and other illnesses, diseases and disease processes, which results in their present medical need for periodic diagnostic medical examinations and monitoring.

362.    Diagnostic testing of Plaintiffs and the Class Members for early detection of cancer and other illnesses, diseases, and disease processes caused by exposure to PFAS chemicals is reasonably and medically necessary to assure early diagnosis and effective treatment of those conditions.

363.    Plaintiffs and the Class Members have suffered the present harm of the need for the cost of diagnostic testing for the early detection of cancer and other illnesses, diseases, and disease processes. As a direct and proximate result of Defendant NEFCO's intentional, willful, wanton, reckless, and/or negligent acts or omissions in connection with its operations at Otter Farm, specifically the use, storage, emission, discharge, disposal, and/or distribution of PFAS chemicals, Plaintiffs and the Class Members require an award of the cost of a medical monitoring program necessary for early detection and treatment of the onset of illnesses, diseases, and disease processes.

364.    Monitoring procedures exist that make possible the early detection of cancer, the progression of biomarker abnormalities, and other illnesses, diseases, and disease processes resulting from exposure to PFAS. These monitoring procedures will benefit Plaintiffs and the Class Members, and they are different from what would normally be recommended in the

absence of PFAS exposure. Such diagnostic testing is reasonably and medically necessary due to the exposure of Plaintiffs and the Class Members to PFAS caused by Defendants.

365.    Because Plaintiffs' and the Class Members' claims are based solely on the amount of exposure to PFAS caused by Defendants, any alleged alternative exposure, or prior medical or family history, is not a basis for Plaintiffs and the Class Members' claims in this case.

366.    As a result, Plaintiffs and the Class should be awarded the quantifiable costs of such a monitoring regime. Plaintiffs and the Class Members also seek all other available and necessary relief in connection with this claim.

FIFTEENTH CLAIM FOR RELIEF
NEGLIGENCE
(Against Defendant NEFCO)

367.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

368.    Defendant NEFCO owed Plaintiffs and the Class Members a duty of reasonable care to avoid dumping, emitting, discharging, disposing, and/or distributing materials with high levels of PFAS chemicals in a manner and location that would cause Plaintiffs and the Class Members injury or harm. Plaintiffs and the Class Members were located within the scope of the risk created by Defendant NEFCO's conduct and they were foreseeable victims of negligent disposal of contaminated waste by Defendant NEFCO.

369.    Defendant NEFCO owed Plaintiffs and the Class Members a duty of reasonable care to eliminate or minimize the disposal of PFAS-contaminated waste in a manner and location where it would be expected to leach into the soil, water, and consumer products sold by MassNatural commensurate with the risk of discharging, disposing, and/or distributing PFAS.

370.     Given the likelihood that Defendant NEFCO was creating PFAS contaminated products and that contamination of land and water that would result in exposure of Westminster to PFAS thus increasing the risk that those residents would develop significant illnesses or diseases, Defendant NEFCO also had a duty to use reasonable care to avoid, minimize, or warn about its use, emission, discharge, disposal, and/or distribution of materials containing high levels of PFAS.

371.     Defendant NEFCO breached its duty to use reasonable care in one or more of the following ways:

a.  By negligently failing to use reasonable care to test and/or screen materials it was dumping or otherwise disposing of at MassNatural's operations at Otter Farm to ensure it was not disposing of materials that would be likely to contaminate soil, groundwater, and consumer products at Otter Farm;

b.  By negligently dumping PFAS-contaminated operations at Otter Farm without taking reasonable steps to prevent or minimize the accumulation and emission of PFAS chemicals into the soil, groundwater, and consumer products at Otter Farm;

c.  By negligently failing to employ safe methods of disposal to adequately prevent, control or eliminate PFAS discharge into the environment;

d.  By negligently failing to institute proper procedures and training to prevent, minimize, and/or promptly and effectively respond to the release of PFAS from its waste products into the environment;

e.  By negligently failing to promptly and effectively respond to its release of PFAS into the environment;

f.   By negligently failing to dispose of its contaminated manufacturing waste in a safer, unpopulated or much less populated area and/or by negligently discharging dangerous amounts of PFAS into land and groundwater near a populated community; and

g.   By negligently failing to warn MassNatural and/or current and potential neighboring residents and property owners near Otter Farm that they were being exposed to PFAS and of the consequent risks of disease the residents acquired because of that exposure.

372.    As a direct and proximate result of Defendant NEFCO's negligence, Plaintiffs and the Class Members have suffered, presently suffer, and will continue to suffer, real property damage, out of pocket expenses, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, upset, aggravation, and inconvenience.

373.    Defendant NEFCO is liable to Plaintiffs and the Class Members for fair compensation for the resulting injuries, which includes pain and suffering, reasonable expenses incurred for medical care and nursing in the treatment and cure of the injury, diminution in earning capacity, and pain and suffering and such medical expenses and diminution in earning capacity as are shown to be reasonably probable to continue in the future.

SIXTEENTH CLAIM FOR RELIEF
PRIVATE NUISANCE
(Against Defendant NEFCO)

374.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

375.    At all relevant times, Defendant NEFCO knew or should have known PFAS chemicals were hazardous and harmful to real property, water, and human beings, and it was substantially certain that the method and manner of Defendant NEFCO's disposal of materials contaminated with PFAS at MassNatural's business at Otter Farm would cause injuries and property damage to Plaintiffs and the Class Members.

376.    Defendant NEFCO, through the negligent, reckless and/or intentional conduct as alleged in this Complaint, have caused contamination with PFAS of real property owned and/or possessed by Plaintiffs and the Class Members.

377.    Defendant NEFCO created a hazardous condition or activity on property at Otter Farm that caused substantial, unreasonable, and foreseeable interference with Plaintiffs' and the Class Members' use and enjoyment of their property. Defendant NEFCO's interference has caused and is causing Plaintiffs and the Class Members to, among other things, refrain from using their land to cultivate and grow fruit, vegetables, and other food and to use their water to drink, cook, or bathe, resulting in significant inconvenience and expense.

378.    By causing contamination with PFAS of real property owned and/or possessed by Plaintiffs and the Class Members, Defendant NEFCO also has substantially interfered otherwise with the Plaintiffs' and Class Members' ability to enjoy their property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that each Class Member chooses.

379.    Defendant NEFCO's conduct was intentional, negligent, reckless, and ultrahazardous and its conduct constitutes a continuous invasion of the property rights of Plaintiffs and the Class Members.

380.    As a direct and proximate result of Defendant NEFCO's dumping, disposal, and/or distribution of PFAS at Otter Farm and the resulting exposure of the persons and/or property of Plaintiffs and the Class Members to PFAS resulting from the conduct of the Defendant NEFCO, Plaintiffs and the Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation, trauma, and inconvenience.

381.    Plaintiffs and the Class Members are therefore entitled to damages, costs, and a judgment that the nuisance be abated and removed.

SEVENTEENTH CLAIM FOR RELIEF
PUBLIC NUISANCE
(Against Defendant NEFCO)

382.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

383.    At all relevant times, Defendant NEFCO knew or should have known PFAS to be hazardous and harmful to real property and human beings, and it was substantially certain that its use, emission, discharge, disposal, and/or distribution of materials containing PFAS at Otter Farm would cause injuries and losses to the persons and property of Plaintiffs and the Class Members.

384.    Plaintiffs, the Class Members, and members of the public have a common right to enjoy their real property free of dangerous contamination of their land and water and to live their lives without exposure to unreasonable levels of toxic PFAS chemicals.

385.    Defendant NEFCO's conduct in arranging for the transport, dumping, and disposal of PFAS-contaminated materials at Otter Farm—deemed hazardous material under Massachusetts law—has contaminated groundwater that supplies water to Plaintiffs, the Class Members, and the public and substantially and unreasonably infringes upon and transgresses the public right of Plaintiffs, the Class Members, and members of the public to enjoy their real property.

386.    Defendant NEFCO knew or should have known that the materials containing PFAS that it dumped, discharged, and disposed of at Otter Farm would have a deleterious effect upon the health, safety, and well-being of people living near Otter Farm, including Plaintiffs and the Class Members.

387.    Defendant NEFCO's use, emission, discharge, disposal, and/or distribution of materials containing PFAS at Otter Farm caused those who owned and/or lived on nearby properties, including Plaintiffs and the Class Members, to come into contact with high levels of PFAS on a routine and constant basis, causing substantially elevated risks of health problems resulting from exposure to dangerous levels of PFAS, as well as property damage and diminished property values.

388.    As a direct and proximate result of Defendant NEFCO's use, emission, discharge, disposal, and/or distribution of materials containing PFAS chemicals at the Otter Farm Property, Plaintiffs' and the Class Members' common right to live free of dangerous, toxic substances was eliminated and/or severely diminished.

389.    As a direct and proximate result of Defendant NEFCO's use, emission, discharge, disposal, and/or distribution of materials containing PFAS at Otter Farm, PFAS chemicals contaminated the land and water owned, possessed, and/or used by Plaintiffs and the Class Members, thereby exposing their bodies to PFAS.

390.    As a direct and proximate result of Defendant NEFCO's use, emission, discharge, disposal, and/or distribution of materials containing PFAS at Otter Farm, Plaintiffs and the Class Members will be forced to pay for the private removal of contaminants from their property emanating from pollution of public water sources.

391.    As a direct and proximate result of Defendant NEFCO's use, emission, discharge, disposal, and/or distribution of materials containing PFAS at Otter Farm and the resulting exposure of Plaintiffs and the Class Members to PFAS, Plaintiffs and the Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expenses, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation, trauma, and inconvenience.

EIGHTEENTH CLAIM FOR RELIEF
WILLFUL AND WANTON CONDUCT
(Against Defendant NEFCO)

392.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

393.    At all times relevant, Defendant NEFCO owed a duty to refrain from willful, wanton, reckless, and/or outrageous conduct and/or conduct that exhibited an utter indifference to and/or conscious disregard of the health, safety, and well-being of Plaintiffs and the Class Members.

394.    Defendant NEFCO at all relevant times was aware of the considerable health risks associated with the discharge of PFAS into soil, groundwater, and consumer products, including the risk of causing various forms of cancer to those exposed by PFAS from soil, water, or other exposures.

395.    Defendant NEFCO at all relevant times knew that its use, emission, discharge, disposal, and/or distribution of materials containing PFAS or likely to contain PFAS would be likely to result in the emission of unreasonably dangerous levels of PFAS into the soil and groundwater in a manner that would be likely to cause significant financial and personal injury to Plaintiffs and the Class Members.

396.    Notwithstanding this knowledge, Defendant NEFCO acted in a manner that was intentional, willful, wanton, reckless, outrageous, and/or demonstrated an indifference to and/or conscious disregard of the health, safety, and well-being of Plaintiffs and the Class Members by, among other things:

      a.  Failing to test and/or screen materials it was dumping or disposing of at Otter Farm, when it knew doing so was required to ensure safe composting without the substantial risk of contaminating soil, groundwater, and its consumer products;

      b.  Failing to take reasonable steps to prevent or minimize the accumulation and emission of PFAS chemicals in materials it dumped or disposed of at Otter Farm, into the soil, when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

   c.   Dumping and/or disposing of PFAS-contaminated waste products at Otter Farm, despite knowing that doing so would likely cause PFAS contamination and the resulting significant financial and/or personal injury to Plaintiffs, the Class Members, and/or the Consumer Subclass;

   d.   Failing to employ safe methods of operation to adequately prevent, control or eliminate PFAS discharge into the environment when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

   e.   Failing to institute proper procedures and training to prevent, minimize, and/or promptly and effectively respond to its release of PFAS into the environment when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

   f.   Failing to promptly and effectively respond to its release of PFAS into the environment when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

   g.   Failing to warn Plaintiffs and the Class Members of its use, emission, discharge, disposal, and/or distribution of materials containing PFAS at Otter Farm, when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

   h.   Failing to ensure it was dumping or disposing of its waste products in an unpopulated or much less populated area when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

i.   Discharging dangerous amounts of PFAS into land and groundwater near a populated community, when it knew doing so would likely cause significant financial and/or personal injury to Plaintiffs and the Class Members; and

j.   Failing to warn current and potential neighboring residents and property owners that they were being exposed to PFAS and of the consequent risks of disease the residents acquired because of that exposure when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members.

397.   As a direct and proximate result of the Defendant NEFCO's willful, wanton, and reckless conduct, Plaintiffs and the Class Members have suffered, presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation, and inconvenience.

NINETEENTH CLAIM FOR RELIEF
MEDICAL MONITORING
(Against Casella Organics)

398.   Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

399.   Plaintiffs and Class Members have been actually and significantly exposed to dangerous levels of PFAS, exceeding the levels deemed dangerous by the MassDEP and which are far higher than normal background levels. As is reported by the EPA, PFAS are dangerous, hazardous, toxic substances that have been proven to cause disease and illness in humans, including but not limited to certain kidney and reproductive cancers.

400.    Plaintiffs' and the Class Members' actual and significant exposure to these dangerous levels of PFAS is the direct and proximate result of Defendant Casella Organics' intentional, willful, wanton, reckless and/or negligent conduct in connection with Defendant Casella Organics' disposal of waste materials contaminated with PFAS chemicals at MassNatural's operations at Otter Farm.

401.    As a direct and proximate result of Defendant's intentional, willful, wanton, reckless and/or negligent conduct in connection with disposal of waste materials contaminated with PFAS chemicals at MassNatural's operations at Otter Farm, Plaintiffs and the Class Members have ingested and absorbed PFAS into their bodies, tissue, and cells where it is known to and has bioaccumulated over time. The presence of this manmade foreign substance, PFAS, in their bodies, tissue, and cells represents a manifest change in Plaintiffs' bodies, tissue and cells and leaves Plaintiffs at an increased risk of serious disease, illness, or injury. This is a physiological change in Plaintiffs' bodies occurring at a subcellular level. Some Plaintiffs and other residents have had their blood tested, and detected the presence of PFAS in their blood above the background level.

402.    Due to these subcellular changes from PFAS exposure, Plaintiffs and the Class Members are at an increased risk of developing cancer and other illnesses, diseases and disease processes, which results in their present medical need for periodic diagnostic medical examinations and monitoring.

403.    Diagnostic testing of Plaintiffs and the Class Members for early detection of cancer and other illnesses, diseases, and disease processes caused by exposure to PFAS chemicals is reasonably and medically necessary to assure early diagnosis and effective treatment of those conditions.

404.    Plaintiffs and the Class Members have suffered the present harm of the need for the cost of diagnostic testing for the early detection of cancer and other illnesses, diseases, and disease processes. As a direct and proximate result of Defendant Casella Organics' intentional, willful, wanton, reckless, and/or negligent acts or omissions in connection with its operations at Otter Farm, specifically the use, storage, emission, discharge, disposal, and/or distribution of PFAS chemicals, Plaintiffs and the Class Members require an award of the cost of a medical monitoring program necessary for early detection and treatment of the onset of illnesses, diseases, and disease processes.

405.    Monitoring procedures exist that make possible the early detection of cancer, the progression of biomarker abnormalities, and other illnesses, diseases, and disease processes resulting from exposure to PFAS. These monitoring procedures will benefit Plaintiffs and the Class Members, and they are different from what would normally be recommended in the absence of PFAS exposure. Such diagnostic testing is reasonably and medically necessary due to the exposure of Plaintiffs and the Class Members to PFAS caused by Defendants.

406.    Because Plaintiffs' and the Class Members' claims are based solely on the amount of exposure to PFAS caused by Defendants, any alleged alternative exposure, or prior medical or family history, is not a basis for Plaintiffs and the Class Members' claims in this case.

407.    As a result, Plaintiffs and the Class should be awarded the quantifiable costs of such a monitoring regime. Plaintiffs and the Class Members also seek all other available and necessary relief in connection with this claim.

TWENTIETH CLAIM FOR RELIEF
NEGLIGENCE
(Against Defendant Casella Organics)

408.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

409.    Defendant Casella Organics owed Plaintiffs and the Class Members a duty of reasonable care to avoid dumping, emitting, discharging, disposing, and/or distributing materials with high levels of PFAS chemicals in a manner and location that would cause Plaintiffs and the Class Members injury or harm. Plaintiffs and the Class Members were located within the scope of the risk created by Defendant Casella Organics' conduct and they were foreseeable victims of negligent disposal of contaminated waste by Defendant Casella Organics.

410.    Defendant Casella Organics owed Plaintiffs and the Class Members a duty of reasonable care to eliminate or minimize the disposal of PFAS-contaminated waste in a manner and location where it would be expected to leach into the soil, water, and consumer products sold by MassNatural commensurate with the risk of discharging, disposing, and/or distributing PFAS.

411.    Given the likelihood that Defendant Casella Organics was creating PFAS contaminated products and that contamination of land and water that would result in exposure of Westminster to PFAS thus increasing the risk that those residents would develop significant illnesses or diseases, Defendant Casella Organics also had a duty to use reasonable care to avoid, minimize, or warn about its use, emission, discharge, disposal, and/or distribution of materials containing high levels of PFAS.

412.    Defendant Casella Organics breached its duty to use reasonable care in one or more of the following ways:

a.  By negligently failing to use reasonable care to test and/or screen materials it was dumping or otherwise disposing of at MassNatural's operations at Otter Farm to ensure it was not disposing of materials that would be likely to contaminate soil, groundwater, and consumer products at Otter Farm;

b.  By negligently dumping PFAS-contaminated operations at Otter Farm without taking reasonable steps to prevent or minimize the accumulation and emission of PFAS chemicals into the soil, groundwater, and consumer products at Otter Farm;

c.  By negligently failing to employ safe methods of disposal to adequately prevent, control or eliminate PFAS discharge into the environment;

d.  By negligently failing to institute proper procedures and training to prevent, minimize, and/or promptly and effectively respond to the release of PFAS from its waste products into the environment;

e.  By negligently failing to promptly and effectively respond to its release of PFAS into the environment;

f.  By negligently failing to dispose of its contaminated manufacturing waste in a safer, unpopulated or much less populated area and/or by negligently discharging dangerous amounts of PFAS into land and groundwater near a populated community; and

g.  By negligently failing to warn MassNatural and/or current and potential neighboring residents and property owners near Otter Farm that they were being exposed to PFAS and of the consequent risks of disease the residents acquired because of that exposure.

413.     As a direct and proximate result of Defendant Casella Organics' negligence, Plaintiffs and the Class Members have suffered, presently suffer, and will continue to suffer, real property damage, out of pocket expenses, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, upset, aggravation, and inconvenience.

414.     Defendant Casella Organics is liable to Plaintiffs and the Class Members for fair compensation for the resulting injuries, which includes pain and suffering, reasonable expenses incurred for medical care and nursing in the treatment and cure of the injury, diminution in earning capacity, and pain and suffering and such medical expenses and diminution in earning capacity as are shown to be reasonably probable to continue in the future.

<u>TWENTY-FIRST CLAIM FOR RELIEF</u>
PRIVATE NUISANCE
(Against Defendant Casella Organics)

415.     Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

416.     At all relevant times, Defendant Casella Organics knew or should have known PFAS chemicals were hazardous and harmful to real property, water, and human beings, and it was substantially certain that the method and manner of Defendant Casella Organics' disposal of materials contaminated with PFAS at MassNatural's business at Otter Farm would cause injuries and property damage to Plaintiffs and the Class Members.

417.     Defendant Casella Organics, through the negligent, reckless and/or intentional conduct as alleged in this Complaint, have caused contamination with PFAS of real property owned and/or possessed by Plaintiffs and the Class Members.

418. Defendant Casella Organics created a hazardous condition or activity on property at Otter Farm that caused substantial, unreasonable, and foreseeable interference with Plaintiffs' and the Class Members' use and enjoyment of their property. Defendant Casella Organics' interference has caused and is causing Plaintiffs and the Class Members to, among other things, refrain from using their land to cultivate and grow fruit, vegetables, and other food and to use their water to drink, cook, or bathe, resulting in significant inconvenience and expense.

419. By causing contamination with PFAS of real property owned and/or possessed by Plaintiffs and the Class Members, Defendant Casella Organics also has substantially interfered otherwise with the Plaintiffs' and Class Members' ability to enjoy their property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that each Class Member chooses.

420. Defendant Casella Organics' conduct was intentional, negligent, reckless, and ultrahazardous and its conduct constitutes a continuous invasion of the property rights of Plaintiffs and the Class Members.

421. As a direct and proximate result of Defendant Casella Organics' dumping, disposal, and/or distribution of PFAS at Otter Farm and the resulting exposure of the persons and/or property of Plaintiffs and the Class Members to PFAS resulting from the conduct of the Defendant Casella Organics, Plaintiffs and the Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation, trauma, and inconvenience.

422. Plaintiffs and the Class Members are therefore entitled to damages, costs, and a judgment that the nuisance be abated and removed.

## TWENTY-SECOND CLAIM FOR RELIEF
PUBLIC NUISANCE
(Against Defendant Casella Organics)

423.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

424.    At all relevant times, Defendant Casella Organics knew or should have known PFAS to be hazardous and harmful to real property and human beings, and it was substantially certain that its use, emission, discharge, disposal, and/or distribution of materials containing PFAS at Otter Farm would cause injuries and losses to the persons and property of Plaintiffs and the Class Members.

425.    Plaintiffs, the Class Members, and members of the public have a common right to enjoy their real property free of dangerous contamination of their land and water and to live their lives without exposure to unreasonable levels of toxic PFAS chemicals.

426.    Defendant Casella Organics' conduct in arranging for the transport, dumping, and disposal of PFAS-contaminated materials at Otter Farm—deemed hazardous material under Massachusetts law—has contaminated groundwater that supplies water to Plaintiffs, the Class Members, and the public and substantially and unreasonably infringes upon and transgresses the public right of Plaintiffs, the Class Members, and members of the public to enjoy their real property.

427.    Defendant Casella Organics knew or should have known that the materials containing PFAS that it dumped, discharged, and disposed of at Otter Farm would have a deleterious effect upon the health, safety, and well-being of people living near Otter Farm, including Plaintiffs and the Class Members.

428.    Defendant Casella Organics' use, emission, discharge, disposal, and/or distribution of materials containing PFAS at Otter Farm caused those who owned and/or lived on nearby properties, including Plaintiffs and the Class Members, to come into contact with high levels of PFAS on a routine and constant basis, causing substantially elevated risks of health problems resulting from exposure to dangerous levels of PFAS, as well as property damage and diminished property values.

429.    As a direct and proximate result of Defendant Casella Organics' use, emission, discharge, disposal, and/or distribution of materials containing PFAS chemicals at the Otter Farm Property, Plaintiffs' and the Class Members' common right to live free of dangerous, toxic substances was eliminated and/or severely diminished.

430.    As a direct and proximate result of Defendant Casella Organics' use, emission, discharge, disposal, and/or distribution of materials containing PFAS at Otter Farm, PFAS chemicals contaminated the land and water owned, possessed, and/or used by Plaintiffs and the Class Members, thereby exposing their bodies to PFAS.

431.    As a direct and proximate result of Defendant Casella Organics' use, emission, discharge, disposal, and/or distribution of materials containing PFAS at Otter Farm, Plaintiffs and the Class Members will be forced to pay for the private removal of contaminants from their property emanating from pollution of public water sources.

432.    As a direct and proximate result of Defendant Casella Organics' use, emission, discharge, disposal, and/or distribution of materials containing PFAS at Otter Farm and the resulting exposure of Plaintiffs and the Class Members to PFAS, Plaintiffs and the Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expenses, personal property damage, loss of use and enjoyment of property, diminution in

property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation, trauma, and inconvenience.

TWENTY-THIRD CLAIM FOR RELIEF
WILLFUL AND WANTON CONDUCT
(Against Defendant Casella Organics)

433.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

434.    At all times relevant, Defendant Casella Organics owed a duty to refrain from willful, wanton, reckless, and/or outrageous conduct and/or conduct that exhibited an utter indifference to and/or conscious disregard of the health, safety, and well-being of Plaintiffs and the Class Members.

435.    Defendant Casella Organics at all relevant times was aware of the considerable health risks associated with the discharge of PFAS into soil, groundwater, and consumer products, including the risk of causing various forms of cancer to those exposed by PFAS from soil, water, or other exposures.

436.    Defendant Casella Organics at all relevant times knew that its use, emission, discharge, disposal, and/or distribution of materials containing PFAS or likely to contain PFAS would be likely to result in the emission of unreasonably dangerous levels of PFAS into the soil and groundwater in a manner that would be likely to cause significant financial and personal injury to Plaintiffs and the Class Members.

437.    Notwithstanding this knowledge, Defendant Casella Organics acted in a manner that was intentional, willful, wanton, reckless, outrageous, and/or demonstrated an indifference to and/or conscious disregard of the health, safety, and well-being of Plaintiffs and the Class Members by, among other things:

a.  Failing to test and/or screen materials it was dumping or disposing of at Otter Farm, when it knew doing so was required to ensure safe composting without the substantial risk of contaminating soil, groundwater, and its consumer products;

b.  Failing to take reasonable steps to prevent or minimize the accumulation and emission of PFAS chemicals in materials it dumped or disposed of at Otter Farm, into the soil, when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

c.  Dumping and/or disposing of PFAS-contaminated waste products at Otter Farm, despite knowing that doing so would likely cause PFAS contamination and the resulting significant financial and/or personal injury to Plaintiffs, the Class Members, and/or the Consumer Subclass;

d.  Failing to employ safe methods of operation to adequately prevent, control or eliminate PFAS discharge into the environment when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

e.  Failing to institute proper procedures and training to prevent, minimize, and/or promptly and effectively respond to its release of PFAS into the environment when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

f.  Failing to promptly and effectively respond to its release of PFAS into the environment when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

g.  Failing to warn Plaintiffs and the Class Members of its use, emission, discharge, disposal, and/or distribution of materials containing PFAS at Otter Farm, when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

h.  Failing to ensure it was dumping or disposing of its waste products in an unpopulated or much less populated area when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

i.  Discharging dangerous amounts of PFAS into land and groundwater near a populated community, when it knew doing so would likely cause significant financial and/or personal injury to Plaintiffs and the Class Members; and

j.  Failing to warn current and potential neighboring residents and property owners that they were being exposed to PFAS and of the consequent risks of disease the residents acquired because of that exposure when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members.

438.   As a direct and proximate result of the Defendant Casella Organics' willful, wanton, and reckless conduct, Plaintiffs and the Class Members have suffered, presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property

damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation, and inconvenience.

REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class Members proposed in this Complaint, request that the Court enter judgment in their favor and against all Defendants as follows:

I.      For an Order certifying the Class, as defined herein, and appointing Plaintiffs and their Counsel to represent the Class;

II.     For an award of damages, including nominal and compensatory damages, as allowed by law and in an amount to be determined;

III.    For an award to Plaintiffs and the Class Members in an amount sufficient to compensate them for real property damage, out of pocket expenses, personal property damage, loss of use and enjoyment of property, diminution in property values, the necessity for long-term medical monitoring, annoyance, upset, aggravation and inconvenience;

IV.     For an award to fund a medical monitoring program in an amount determined to be just and reasonable;

V.      For an award of punitive damages as allowed by law and in an amount to be determined;

VI.     For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

VII.    For prejudgment interest on all amounts awarded;

VIII.   For injunctive and declaratory relief, under Rule 23(b)(2) and (c)(4) and as otherwise allowed by law, including,

106

     a.  Injunctive relief under Rule 23(b)(2) as necessary and appropriate to establish a court-supervised program of medical monitoring for the medically necessary diagnostic testing for the early detection of illness, disease, or disease process; and

     b.  Issue certification under Rule 23(c)(4) as necessary and appropriate to provide declaratory relief as to each element of each cause of action alleged herein (medical monitoring, ultrahazardous activity/strict liability, private nuisance, public nuisance, negligence, and willful and wanton conduct).

IX.    Such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a jury trial on all issues so triable.

DATED:     February 23, 2025     Respectfully submitted,

*/s/ Sean K. McElligott*
Sean K. McElligott (BBO #651710)
Ian W. Sloss (*pro hac vice* forthcoming)
Johnathan Seredynski (*pro hac vice* forthcoming)
Krystyna D. Gancoss (*pro hac vice* forthcoming)
Kate Sayed (*pro hac vice* forthcoming)
SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, Connecticut 06901
Telephone: (203) 325-4491
Facsimile: (203) 325-3769
isloss@sgtlaw.com
smcelligott@sgtlaw.com
jseredynski@sgtlaw.com
kgancoss@sgtlaw.com
ksayed@sgtlaw.com

David C. Strouss, BBO#546253
Christian Uehlein, BBO#667325

107

Leah M. McMorris, BBO#681437
THORNTON LAW FIRM LLP
84 State Street, 4th Floor
Boston, MA 02109
(617) 720-1333  FAX (617) 720-2445
dstrouss@tenlaw.com
cuehlein@tenlaw.com
lmcmorris@tenlaw.com

*Counsel for Plaintiffs Thomas Ryan, Susan Ryan,
Sean Gallagher, Ashley Sultan Gallagher,
Michele Burt, Nancy Donovan, and Lauren Ladue*